**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Horton,* **Slip Opinion No. 2019-Ohio-4139.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-4139

DISCIPLINARY COUNSEL *v.* HORTON.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Horton,* Slip Opinion No. 2019-Ohio-4139.]**

*Attorneys at law—Misconduct—Criminal convictions for failure to file a complete and accurate campaign statement—Misuse of county resources and staff by allowing staff to work on judicial campaign during work hours and at public expense—Inappropriate sexual conduct—Violations of the Rules of Professional Conduct and the Code of Judicial Conduct, including committing an illegal act that reflected adversely on trustworthiness and honesty, undermining public confidence in the integrity of the judiciary, and engaging in harassment based on sex in the performance of judicial duties—Indefinite suspension with conditions for reinstatement.*

(No. 2018-1746—Submitted May 7, 2019—Decided October 10, 2019.)

ON CERTIFIED REPORT of the Board of Professional Conduct
of the Supreme Court of Ohio, No. 2018-010.

_____

**O'CONNOR, C.J.**

**{¶ 1}** Relator, disciplinary counsel, filed a three-count complaint against respondent, Timothy Solomon Horton, of Lewis Center, Ohio, Attorney Registration No. 0065934. Horton was admitted to the practice of law in Ohio in 1996. Horton served as a judge on the Franklin County Court of Common Pleas from 2006 until he was elected to the Tenth District Court of Appeals, which he joined in 2015. He submitted his judicial resignation to that court effective February 28, 2019.

**{¶ 2}** In a complaint certified to the Board of Professional Conduct on January 30, 2018, disciplinary counsel alleged that Horton violated multiple provisions of the Code of Judicial Conduct and two provisions of the Rules of Professional Conduct.

**{¶ 3}** Count One arose from Horton's guilty plea to misdemeanor charges of failing to file accurate campaign statements. Count Two alleged that as a common-pleas-court judge, Horton had misused county resources and staff for work on his 2014 campaign for Tenth District Court of Appeals judge. Count Three alleged sexual misconduct by Horton in 2013 and 2014, including that he had sexually harassed a legal intern in his office (both during and after her internship) and his secretary.

**{¶ 4}** A panel of the board held a five-day hearing during which 16 witnesses testified. The panel found that respondent had violated the Code of Judicial Conduct and the Rules of Professional Conduct and recommended that he be suspended from the practice of law for two years, with one year of the suspension stayed if he met certain conditions. The conditions included an evaluation by the Ohio Lawyers Assistance Program ("OLAP"), continued attendance at Alcoholics Anonymous, and no further contact with any of the female employees or interns who had testified in the proceedings.

2

**{¶ 5}** The board adopted the panel's findings of fact and conclusions of law, but it disagreed with the recommended sanction. The board recommended that respondent be indefinitely suspended from the practice of law in Ohio, with reinstatement conditioned on his (1) continued participation in Alcoholics Anonymous, (2) submission to a new OLAP evaluation and compliance with any treatment and counseling recommendations arising from the evaluation, (3) not contacting the former female employees and interns who had testified in the disciplinary proceedings, and (4) payment of costs of the proceedings.

**{¶ 6}** Horton raises three objections to the board's findings and recommendation. He argues that the panel erred by prohibiting the introduction of evidence as to whether his conduct was unwelcome, that Count Two was unwarranted and should be dismissed, and that the board's recommended sanction was not warranted based on the facts and this court's precedent.

**{¶ 7}** We have reviewed the parties' arguments and the record. For the reasons set forth below, we adopt the board's findings of fact and conclusions of law and adopt the board's recommended sanction.

**Misconduct**

*Count One—Criminal Conviction*

**{¶ 8}** Count One charged Horton with violations of Jud.Cond.R. 1.2 and Prof.Cond.R. 8.4(b) and (c). Jud.Cond.R. 1.2 requires a judge to act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary and to avoid impropriety and the appearance of impropriety. Prof.Cond.R. 8.4(b) states that it is professional misconduct to commit an illegal act that reflects adversely on the lawyer's honesty or trustworthiness; Prof.Cond.R. 8.4(c) states that it is professional misconduct to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

**{¶ 9}** This count arises from Horton's criminal convictions. Horton pleaded guilty to three misdemeanor counts of violating R.C. 3517.13(B) by failing to file

3

a complete and accurate campaign statement. Near the end of 2013, Horton decided to run for a seat on the Tenth District Court of Appeals. In March 2014, he learned that he would be unopposed for the seat. In celebration, he held a private dinner, which cost $1,014.09, at a restaurant in downtown Columbus. He paid for the event with campaign funds and reported the expenditure on his campaign-finance report. The first count of the criminal complaint, to which Horton admitted guilt, charged that Horton caused an inaccurate campaign-finance report to be filed with the secretary of state by reporting an expenditure of an unreasonable and excessive amount.

{¶ 10} The second count of the criminal complaint concerned a campaign fundraiser held in early March 2014, before it was clear that Horton would be unchallenged. The fundraiser, held at a restaurant in downtown Columbus, had only one attendee other than Horton's court and campaign staff but cost $978.75. Horton pleaded guilty to this count for causing an inaccurate campaign-finance report to be filed with the secretary of state, thereby admitting that he had reported the expenditure knowing that it was an excessive and unreasonable amount.

{¶ 11} The third count of the criminal complaint concerned a $173.29 expense that Horton reported for cigars that were to be made available to supporters during campaign functions. Horton made the purchase in July 2014, well after he learned he would run unopposed. Again, Horton admitted guilt for willfully reporting an expenditure of an unreasonable and excessive amount, causing an inaccurate finance report to be filed with the secretary of state.

{¶ 12} The trial court sentenced Horton to serve ten days in the Franklin County Corrections Center, undergo a drug and alcohol assessment and complete follow-up treatment, pay restitution to the Mid-Ohio Foodbank in the amount of $2,065, complete 100 hours of community service, verify that he attended at least one Alcoholics Anonymous meeting per week, and stay involved in the OLAP

4

program. He appealed, and the Tenth District Court of Appeals affirmed. *State v. Horton*, 2017-Ohio-8549, 99 N.E.3d 1090 (10th Dist.).

{¶ 13} Horton admitted that his conduct violated Jud.Cond.R. 1.2 but denied that it violated Prof.Cond.R. 8.4(b) or (c). The panel dismissed the Prof.Cond.R. 8.4(c) charge but found by clear and convincing evidence that Horton violated Jud.Cond.R. 1.2 and Prof.Cond.R. 8.4(b) by committing an illegal act that reflected adversely on his trustworthiness and honesty and by undermining public confidence in the integrity of the judiciary. The board adopted the panel's findings of fact and conclusions of law on Count One.

*Count Two—Misuse of County Resources and Staff*

{¶ 14} The second count of the disciplinary complaint charged Horton with violations of Jud.Cond.R. 1.2 and 4.4(B) for (1) allowing his judicial staff to work on his judicial campaign during work hours and at public expense, (2) using county resources for his judicial campaign, and (3) directing his judicial staff to be involved in the receipt, handling, and delivery of campaign contributions and funds. Jud.Cond.R. 4.4(B) states that a judicial candidate shall prohibit public employees subject to his or her direction or control from soliciting or receiving campaign contributions.

{¶ 15} Horton admitted that he had told his court staff, "If you want to work on [the campaign], you want to volunteer, that's great, you know I would appreciate it." Despite Horton's phrasing the statement as an invitation and not a directive, his secretary, Elise Wyant, and staff attorney, Emily Vincent, testified they did not feel comfortable not volunteering for his campaign.

{¶ 16} Horton testified that he understood that campaign work should not be conducted on county time or using county equipment. He also testified that he had encouraged his staff to attend a seminar that explained some of the campaign rules and restrictions applicable to judicial candidates, their staff, and volunteers. But beyond encouraging his staff to attend that seminar, Horton made only limited

efforts to ensure that his staff did not work on his campaign using county time or resources. Horton's judicial staff testified he made requests for them to conduct campaign business during hours when they would normally be performing county work. In response, Horton blamed his staff for not policing themselves more strictly in their capacity as campaign volunteers. For example, although Horton's staff was relatively inexperienced in politics, Horton believed it was entirely the staff's obligation to document leave from their county jobs to work on the campaign.

{¶ 17} Wyant testified that Horton would send her campaign work at any time of the day, regardless of whether she was at work. Vincent testified that Horton asked her to do work supporting his campaign during her normal workday on at least two occasions. And Horton's campaign consultant, Bridgette Tupes, testified that she had conversations with him about the optics of allowing his staff to be seen doing campaign work because she was concerned about public perception.

{¶ 18} Specifically, Horton asked Vincent, during work hours, to pull cases in which Columbus was a party, prior to his meeting with the city's mayor. Horton denied that the information had been compiled to gain a political endorsement but explained that he had asked for it "[t]o do due diligence and—and make sure [he was] properly prepared when [he met] with electeds, particularly during campaign season." Thus, the work was undeniably for the campaign. He also asked her to compile a list of attorneys who had practiced before him in cases involving Ohio's casinos and racinos; he told Vincent that the list was for fundraising purposes. There is also overwhelming evidence that Horton asked Wyant, during work hours, to send letters responding to candidate-screening committees, although he did not specifically direct her to compose the letters during work hours. Wyant also attended several golf outings with Horton, most of which were related to his campaign, without submitting time-off requests or taking vacation time. And

Horton directed her to pick up and deliver campaign-related checks, which she did during the work day.

{¶ 19} Additionally, Horton was aware that at least two attorneys had dropped off campaign contributions to his office at the court and that Wyant had accepted the contributions. Wyant told Horton about the checks, and rather than explain to her that she was not allowed to accept campaign contributions, Horton asked her the amount of the checks. Horton also knew or should have known that Wyant was accepting checks at the end of a fundraiser when Tupes had to leave early.

{¶ 20} Horton testified that his staff had not had standard hours or even a required number of hours and that their work schedule was flexible. He argued that it was the employees' prerogative whether to work on his campaign during their lunch or after work. Horton contended that he expected his employees to use their own personal laptop computers to do campaign work at the office during lunchtime, so they should not have used any county equipment for campaign work.

{¶ 21} The panel concluded that Horton "had an affirmative duty to make certain that his staff was not violating the Rules when they were working on his campaign." It found that disciplinary counsel proved by clear and convincing evidence that Horton violated Jud.Cond.R. 1.2 and 4.4(B). The board adopted the panel's findings of fact and conclusions of law for Count Two.

*Count Three—Inappropriate Sexual Conduct*

{¶ 22} The third count of the complaint charged Horton with directing inappropriate sexual comments and conduct to members of his staff from the summer of 2013 until the autumn of 2014. The complaint alleged that this behavior violated Jud.Cond.R. 1.2, 1.3, and 2.3(B) and Prof.Cond.R. 8.4(h). Jud.Cond.R. 1.3 prohibits a judge from abusing the prestige of judicial office to advance the personal or economic interests of the judge or others or allowing others to do so. Jud.Cond.R. 2.3(B) prohibits a judge, in the performance of judicial duties, from

manifesting bias or prejudice by words or conduct, or engaging in harassment, including but not limited to bias, prejudice, or harassment based upon sex. Under Prof.Cond.R. 8.4(H), it is professional misconduct for a lawyer to engage in conduct that adversely reflects on the lawyer's fitness to practice law.

{¶ 23} Disciplinary counsel charged Horton with inappropriate sexual comments and conduct involving Wyant and M.B., a law student who interned in Horton's office. Horton's behavior ranged in both frequency and severity. His court staff described the context for this misconduct—an atmosphere in which Horton frequently lectured his staff and interns about loyalty and referred to the power he had as a judge.

{¶ 24} Horton created an inappropriate atmosphere in his office by telling members of his staff they were sexy during the work day and commenting on the attractiveness of other employees. He told M.B. that he had asked her to attend a meeting so that he would have "something pretty to look at." He made clear to Wyant that she was to be at his beck and call while working on his campaign. Several members of his staff believed it would be inappropriate for them to turn down Horton's happy-hour invitations, which were frequent. Horton admitted that his behavior at happy hours and other times when he was intoxicated was "rude" and "obnoxious."

{¶ 25} But Horton's inappropriate conduct was beyond rude. Vincent, his staff attorney, testified that Horton had said her tights were sexy and, during a happy hour, told her that he would get in trouble for telling her how he would make her over.

{¶ 26} Horton's behavior with Wyant, who was 25 years old at the time, and M.B., who was 23 years old, was even worse. Following one happy hour, after M.B. had completed her internship, but while she was still a law student, she and Horton engaged in sexual conduct. M.B. testified that she had participated because she knew Horton wanted her to. On three other occasions, Horton encouraged his

friends to touch M.B. inappropriately, and she was groped by his friends on at least two occasions, at Horton's insistence. Horton also repeatedly told Wyant that she "looked sexy" and that he wanted to "fuck" her.

{¶ 27} Some of Horton's behavior was corroborated by Tupes, Horton's campaign consultant. Tupes testified that Horton had said, in Tupes's presence, that he wanted to engage in sexual acts with Wyant. Tupes also testified that although both Horton and Wyant engaged in discussions about sex, Horton had initiated "the flirting" and was "more derogatory." And Horton admits he engaged in explicit sexual conversations with Wyant.

{¶ 28} Wyant admitted that her own behavior was not faultless. And M.B. described feeling as though Horton was grooming her. Wyant testified that he made her feel valuable only for her looks, not her work. She also stated that Horton got angry on one occasion when she objected to his sexual statements and that she had worried it would affect her job if she told Horton that she was uncomfortable. Horton, however, argued that Wyant and M.B. had consented to his sexual conduct and statements.

{¶ 29} The panel found that Horton's behavior was predatory. The panel also found clear and convincing evidence that Horton violated Jud.Cond.R. 1.2, 1.3, and 2.3 and Prof.Cond.R. 8.4(h).

{¶ 30} The board adopted the panel's findings and conclusions of law. Considering all three charges, the board increased the panel's recommended sanction from a two-year suspension with one year stayed on conditions to an indefinite suspension with conditions for Horton's reinstatement to the practice of law.

### Horton's Objections to the Board Report

{¶ 31} Horton raises three objections to the board's decision. First, he states that the panel erred by refusing to allow him to introduce evidence addressing whether his conduct in Count Three was unwelcome. Second, he argues that the

court should dismiss Count Two in its entirety. Third, he states that the sanction recommended by the board is neither supported by this court's precedent nor warranted by the facts.

*Objection One—Violation of Due Process*

**{¶ 32}** Horton's first argument is that the panel violated his right to due process with respect to the violation of Jud.Cond.R. 2.3(B). Comment [4] to Jud.Cond.R. 2.3 notes that "[s]exual harassment *includes, but is not limited to*, sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome." (Emphasis added.) According to Horton, he was denied due process and the right to defend himself when the panel refused to allow him to present evidence that his conduct was not unwelcome.

**{¶ 33}** "The standards of due process in a disciplinary proceeding are not equal to those in a criminal matter. * * * A disciplinary proceeding is instituted to safeguard the courts and to protect the public from the misconduct of those who are licensed to practice law, and is neither a criminal nor a civil proceeding." *In re Judicial Campaign Complaint Against Carr*, 76 Ohio St.3d 320, 322, 667 N.E.2d 956 (1996).

**{¶ 34}** In support of his argument that the panel improperly excluded evidence and denied him due process, Horton cites on *Disciplinary Counsel v. Smith*, 143 Ohio St.3d 325, 2015-Ohio-1304, 37 N.E.3d 1192. In *Smith,* the panel quashed subpoenas for documentary evidence that the respondent argued would support his defense. *Id.* at ¶ 13. This court found that the evidence "in all probability would serve to either confirm or discredit Smith's claims." *Id.* at ¶ 14. But as Horton admits, this case is factually quite different from *Smith*.

**{¶ 35}** Unlike the respondent in *Smith*, Horton does not allege that the panel prevented Horton from issuing a subpoena for any documents or witnesses. Instead, the panel here prevented lines of questioning of witnesses at the hearing,

and it based that decision on the ground that the subject matter of the questions was not relevant or the questions were improper attempts to impeach a witness.

{¶ 36} The evidence Horton sought to adduce is very different in substance from the evidence at issue in *Smith*. The evidence in *Smith* was likely dispositive. Horton made two evidentiary proffers at the disciplinary hearing, setting forth the evidence he would attempt to elicit, if the panel permitted, to prove his behavior with M.B. and Wyant had not been unwelcome. The first proffer concerned questions he wanted to ask Wyant about some of the specific conversations between the two that Horton alleged included explicit sexual content. The second proffer involved questions he wanted to ask Atiba Jones, the administrator of the Franklin County Court of Common Pleas, about his opinion whether Horton's conduct was unwelcome, based on Jones's perception after seeing Wyant and M.B. at a single happy hour.

{¶ 37} Unlike in *Smith*, the evidence Horton sought to admit was not dispositive or even likely to be highly probative, and it would not have confirmed or discredited his defense. Viewing the record as whole, the panel did not err in excluding these lines of questioning.

{¶ 38} The panel also did not stop Horton from providing his own explanation of the circumstances surrounding his conduct or from questioning Wyant and M.B. about their feelings concerning the conduct. Horton was very clear in stating his opinion that his 23-year-old intern and 25-year-old secretary had been eager participants in his sexual conversations and conduct. Wyant and M.B. admitted they had not always objected to his behavior as it was happening. Wyant admitted that she had joked around with Horton and engaged in explicit sexual conversations with him. M.B. acknowledged her hesitation in coming forward because she was not a "perfect victim."

{¶ 39} When asked why she had engaged in explicit sexual discussions with Horton, Wyant explained:

It's the—I mean, that's the culture that he created in the office, that it was—It wasn't a professional culture. It was—You know, the culture is created by the leader, and the leader being the Judge. He would describe—He would talk about things that—that he wanted to talk about, and so when, you know, I was talking about my personal life I took the direction from my leader and, you know, I would get personal with my stories, too.

She described how she "came to realize that this—through conversations with friends and—like, this wasn't normal, this wasn't a—a normal working environment. This culture that he created wasn't a good one and it wasn't professional at all."

{¶ 40} When asked to explain why she had consented to engaging in sexual conduct with Horton even though she did not want to, M.B. explained, "I felt like I had to do what Judge Horton wanted me to do. And, you know, I think at the time, 23 at this point, like, I was naive, certainly, but I also think I was just doing the best that I could, you know." M.B. further explained:

[T]his is a person who has power over me and I have to go along with what he says. And I don't know, like, why I still trusted him, and thought, you know, it would be different, perhaps.

I still saw him as a mentor, which sounds ridiculous after he's done these horrible things to me; right?

But I think, too, I was—You know, the harassment during my internship, right, it started so incrementally, right, that if he had told me he wanted to fuck me in the ass my third week on the job, I would have been more objected—I would have objected more or,

12

you know, maybe reported it, or done something, but, like, it occurred so incrementally that you almost didn't see it coming, you know, like you didn't realize how bad the situation you were in until it was too late to do anything about it, you know. And I—I think there was also, like, a lot of self-blame involved of, you know, it must be—it must be my fault because, like, he's—he's turned me into this sexual object, and so, like, this is just what I know and this is how it works, you know.

**{¶ 41}** After hearing all the testimony, the panel concluded that Wyant, Tupes, Vincent, and M.B. were "highly credible witnesses" who had no motivation to lie or falsely accuse Horton, while Horton was less than forthright.

**{¶ 42}** Based on the testimony admitted at the hearing and Horton's proffers, we hold that the panel did not err in excluding the questions. At best, the evidence Horton sought to adduce would have been cumulative of the other evidence showing that Wyant and M.B. did not always clearly object to his conduct. But even if Horton's sexual misconduct was not criminal or did not create civil liability, the Code of Judicial Conduct does not merely proscribe crimes or discrimination—it recognizes the power and authority of judges and sets a higher standard. It also does not police the conduct of judicial employees. The Code of Judicial Conduct is specifically concerned with the actions of judges. The issue is not whether Wyant objected to each of Horton's inappropriate statements or acquiesced to the inappropriate culture Horton created at his office or if M.B. implicitly consented to his sexual conduct. Horton engaged in sexual harassment in the performance of his judicial duties, abused the prestige of his office for his own personal interests, and acted in a manner that brings disrepute to the judiciary.

**{¶ 43}** As a judge and a supervisor, Horton held a position of power over his staff and interns. He repeatedly emphasized his power and the importance of

loyalty to him. And it seems to be no coincidence that Horton's most egregious behavior occurred with and around the younger, less professionally experienced members of his staff who he could more easily manipulate. As did the panel, we find that his behavior was predatory.

{¶ 44} Ample evidence demonstrates that Horton engaged in sexual harassment in violation of Jud.Cond.R. 2.3(B), and the panel's refusal to permit certain lines of questioning in no way changes that conclusion. We hold that the panel did not err or violate Horton's due-process rights, and we overrule his first objection.

*Objection Two—Count Two Should Be Dismissed*

{¶ 45} Horton's next objection asserts that Count Two should be dismissed in its entirety for two reasons.

{¶ 46} First, Horton argues that because his judicial staff was exempt from overtime pay and had a flexible schedule, there is not clear and convincing evidence that his staff performed campaign work on county time. Horton analogizes his case to a 2004 decision by this court, *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286. In that case, the panel found that Judge O'Neill's staff attorney was a "salaried professional with flexible work hours" and therefore the evidence did not establish that she had performed campaign work on county time. Instead, the panel found that the staff attorney spent a de minimis amount of time working on the campaign—she picked up t-shirts twice, made two or three trips to a local print company for car signs, folded and stuffed campaign literature on two occasions, and occasionally accompanied the judge on lunchtime trips to meet with the campaign's treasurer. There was also testimony that the staff attorney worked more than 40 hours per week.

{¶ 47} In this case, the time at issue was not de minimis. In addition to working on the campaign while in the office on county time and occasionally making short trips to pick up and drop off campaign checks, Wyant spent entire

14

days, days that were not recorded as time off, out of the office attending golf outings on behalf of the campaign. And Wyant never worked more than 40 hours a week; indeed, she typically worked fewer than 40 hours.

{¶ 48} Horton attempts to absolve himself by stating that his judicial employees were responsible for their own timekeeping and leave requests. However, it was Horton's decision not to keep a closer eye on his employees' time or to create a stronger ethic of professionalism in the office. And again, the employees' culpability is not at issue. If a sitting judge chooses to allow public employees to volunteer to work on his or her campaign, it is incumbent upon the judge to uphold the integrity of the judiciary by imposing clear rules prohibiting campaign work on county time or using county resources and strictly enforcing those rules. If a judge does not feel confident about his or her ability to make and enforce such rules, then the judge should not accept assistance from public employees.

{¶ 49} Horton, not his staff, was subject to Jud.Cond.R. 1.2, which requires that a judge "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary." By failing to impose strict standards on his staff concerning the use of public time and resources, Horton failed to promote public confidence in the integrity and impartiality of the judiciary. Sufficient evidence supported the board's finding that Horton violated Jud.Cond.R. 1.2.

{¶ 50} Second, Horton argues that the board erroneously found that he violated Jud.Cond.R. 4.4(B) based on Wyant's handling of campaign *expenditures*, including payments from the campaign to sponsor charity golf outings and wellness walks, not campaign *contributions*. But Horton entirely ignores the board's finding that on two occasions, lawyers dropped off campaign contributions to Wyant in Horton's chambers. Jud.Cond.R. 4.4(B) states that a judicial candidate shall prohibit public employees subject to his or her direction or control from soliciting

or *receiving* campaign contributions. Horton knew about the checks because Wyant told him that they had been dropped off, and rather than instruct her not to accept contributions, he asked the amount of the checks. These two incidents are sufficient to constitute a violation of Jud.Cond.R. 4.4(B) as well as a violation of Jud.Cond.R. 1.2 as alleged in Count Two. We overrule Horton's second objection.

*Objection Three—An Indefinite Suspension Is Not Supported by the Evidence or by Precedent*

{¶ 51} Horton's third objection is that an indefinite suspension is not supported by this court's precedent or the evidence. Horton states that applicable precedent comes from two lines of cases, the first addressing reporting and financial issues and the second addressing sexual-harassment issues. In his view, the board's recommendation of an indefinite suspension came from only the sexual-harassment line of cases, and he argues that those cases suggest that an actual suspension of, at most, six months is appropriate, although he argues that the *most* analogous cases resulted in stayed suspensions. Horton further argues that the cases concerning reporting inaccuracies suggest that either a reprimand or fully stayed suspension would be an appropriate sanction.

{¶ 52} We disagree with Horton's position for several reasons. First, although both he and the board suggest that there are two lines of relevant cases, there are actually three. Horton and the board did not consider those cases in which an elected official improperly used county resources for campaign work or allowed a public employee subject to the judge's direction or control to solicit or receive campaign contributions. *See, e.g.*, *Disciplinary Counsel v. Evans*, 89 Ohio St.3d 497, 499, 733 N.E.2d 609 (2000). The appropriate sanction must protect the public from the type of harm that is the subject of all three charges.

{¶ 53} Second, Horton incorrectly believes that cases imposing sanctions for actions involving only *one* form of misconduct—for example, cases involving only misreporting, only misuse of government resources, or only sexual

16

misconduct—identify the appropriate punishment here. This case includes violations in three separate areas, and in determining the sanction necessary to protect the public, we must take into account the cumulative array of Horton's violations. Imposing a sanction that is equivalent to a sanction in a case with only one type of violation would demean the number and severity of Horton's infractions.

{¶ 54} Third, Horton's suggestion that the board's sanction is based entirely on the sexual-harassment line of cases is also unavailing. The board explained that its recommendation to impose a harsher sanction than the panel had recommended was "predicated on Respondent's predatory and harmful conduct toward and the vulnerability of the victims of his conduct and the flagrant abuse of his position of authority vis-à-vis * * * Wyant and MB." But "[f]or these reasons and those cited by the panel, the Board conclude[d] that a longer suspension" was necessary. In recommending an indefinite suspension, the board took all of the panel's findings and this court's precedent into account, not just those related to sexual misconduct, as Horton suggests.

{¶ 55} We are also not persuaded by Horton's argument distinguishing cases that the board relied on in determining the sanction. He argues that the conduct at issue in *Lake Cty. Bar Assn. v. Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180; *Disciplinary Counsel v. Skolnick*, 153 Ohio St.3d 283, 2018-Ohio-2990, 104 N.E.3d 775; and *Disciplinary Counsel v. Sarver*, 155 Ohio St.3d 100, 2018-Ohio-4717, 119 N.E.3d 405, was more severe than his but that the lawyers involved in those cases received lighter sanctions. But as Horton recognizes, those cases involved lawyers, not judges. The board reasonably relied on the actual suspension imposed in those cases, coupled with the "position of trust and authority" that Horton exploited "for his personal gratification" and his significant misconduct in relation to his campaign, as a basis for recommending a

more severe sanction than was imposed in those cases or recommended by the board in this case.

{¶ 56} And finally, Horton asks this court to consider two other cases that he believes support his argument against an indefinite suspension, *Cincinnati Bar Assn. v. Young*, 89 Ohio St.3d 306, 731 N.E.2d 631 (2000), and *Disciplinary Counsel v. Campbell*, 68 Ohio St.3d 7, 623 N.E.2d 24 (1993). Those cases may be useful for comparison, but the respondents in those cases were not charged with violating Jud.Cond.R. 2.3, which had not been adopted at the time the cases were decided. Horton's case appears to be one of first impression applying Jud.Cond.R. 2.3 to sexual misconduct.

{¶ 57} Jud.Cond.R. 2.3 was adopted in 2009. *See* 120 Ohio St.3d XCVIII. Although the previous version of the judicial code included canons that prohibited a judge, in the performance of judicial duties, by words or conduct, from manifesting bias or prejudice, including bias or prejudice based upon gender, *see* former Canons 3(B)(5) and (6) of the Code of Judicial Conduct, 78 Ohio St.3d CLXV, CLXXIII, the specific prohibition on sexual harassment was not added until 2009, when the court adopted a code closely aligned with the American Bar Association's ("ABA's") Model Code of Judicial Conduct. The ABA's Model Code included the sexual-harassment language because "the Commission was persuaded that sexual harassment deserves special mention, given the significance of the problem and that harassment per se was sufficiently distinct from bias and prejudice to deserve separate mention in the black-letter rule." Harrison, *The 2007 ABA Model Code of Judicial Conduct: Blueprint for a Generation of Judges*, 28 Just.Sys.J. 257, 263 (2007). Horton was on notice that sexual harassment in the performance of his judicial duties was strictly prohibited.

{¶ 58} We find that Horton did not establish that the recommended sanction is unsupported by precedent, because this case involves multiple violations of provisions of the Judicial Code of Conduct, including one provision for which this

is a case of first impression, and of the Rules of Professional Conduct,. Further, given the number and severity of violations, we do not find that the sanction is unwarranted by the facts.

{¶ 59} We overrule Horton's third objection, and we adopt the board's findings of fact and misconduct and conclusions of law as to all three charges.

### Sanction

{¶ 60} Having adopted the board's findings of fact and misconduct and overruled Horton's objections, we now consider the appropriate sanction. "[T]he primary purpose of disciplinary sanctions is not to punish the offender, but to protect the public." *O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, at ¶ 53. But sanctions also serve as a deterrent to similar violations by judges, lawyers, and judicial candidates in the future. *See, e.g.*, *In re Judicial Campaign Complaint Against Brigner*, 89 Ohio St.3d 1460, 732 N.E.2d 994 (2000), citing *In re Judicial Campaign Complaint Against Morris*, 81 Ohio Misc.2d 64, 65, 675 N.E.2d 580 (1997). And importantly, sanctions notify " 'the public of the self-regulating nature of the legal profession and enhance public confidence in the integrity of judicial proceedings.' " *Disciplinary Counsel v. Tamburrino*, 151 Ohio St.3d 148, 2016-Ohio-8014, 87 N.E.3d 158, ¶ 44, quoting *In re Judicial Campaign Complaint Against O'Toole*, 141 Ohio St.3d 355, 2014-Ohio-4046, 24 N.E.3d 1114, ¶ 64.

{¶ 61} When determining what sanction to impose for judicial and attorney misconduct, we consider the duties that were violated, the harm that occurred, any aggravating or mitigating factors, and the sanctions imposed in similar cases. *Disciplinary Counsel v. Broeren*, 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21; *see also Disciplinary Counsel v. Elum*, 148 Ohio St.3d 606, 2016-Ohio-8256, 71 N.E.3d 1085, ¶ 9.

{¶ 62} As we have described, Horton committed multiple violations of four provisions of the Code of Judicial Conduct and two provisions of the Rules of

Professional Conduct. His actions—abusing his staff, allowing his staff to use county time and materials to work on his campaign, filing false campaign-finance reports, and apparently attempting to use his role as a judge, including his previous rulings, to win endorsements and campaign contributions—undermined the public's faith in the judiciary. His actions impaired the public's faith in an impartial judiciary, and they were particularly harmful to his judicial staff who risked their own employment and reputations by conducting campaign work on county time under Horton's supervision.

{¶ 63} The board identified eight aggravating factors that relate to six of the potential aggravating factors described in the Rules for the Government of the Bar of Ohio:

- Horton committed multiple violations of both the Ohio Rules of Judicial Conduct and the Rules of Professional Conduct, Gov.Bar.R. V(13)(B)(4);

- Horton has refused to accept responsibility for his misconduct, Gov.Bar.R. V(13)(B)(7);

- Horton attempted to shift the blame for some of his rule violations to his employees. An example of this was Horton's theme of his case. In the opening statement for Horton, his counsel stated, *"She gave as much as she got,"* (emphasis added), Gov.Bar.R. V(13)(B)(7);

- Rather than from inadvertence, as Horton has suggested or claimed, a substantial number of rule violations committed by Horton resulted from his intentional conduct and therefore constitutes a pattern of misconduct, Gov.Bar.R. V(13)(B)(3);

- Horton acted with a dishonest or selfish motive in his dealings with his employees and with respect to his use of campaign funds for impermissible purposes, Gov.Bar.R. V(13)(B)(2);

- Horton's response to the charges against him in these disciplinary proceedings lacks credibility and calls into question his character as an attorney, Gov.Bar.R. V(13)(B)(6);

- Horton's actions in dealing with his employees constitute sexual harassment, Gov.Bar.R. V(13)(B)(8); and

- Horton's actions had a detrimental effect on at least one of his employees, Gov.Bar.R. V(13)(B)(8).

{¶ 64} The board also identified four potential mitigating factors, although it determined that one, testimony about his alcohol use, did not rise to the level necessary for mitigation under the Rules for the Government of the Bar of Ohio:

- Horton has no prior discipline, Gov.Bar.R. V(13)(C)(1);

- Horton suffered, as it relates to count one, an imposition of other penalties and sanctions, Gov.Bar.R. V(13)(C)(6);

- Horton presented substantial testimony regarding his use and abuse of alcohol, Gov.Bar.R. V(13)(C)(7); and

- There was substantial character testimony on Horton's behalf, Gov.Bar.R. V(13)(C)(5).

{¶ 65} The board found that there was insufficient evidence to credit Horton's substance abuse as mitigating. Under Gov.Bar.R. V(13)(C)(7), in order for a substance-abuse disorder to qualify as mitigating, there must be evidence to support a finding of all the following:

(a) A diagnosis of a disorder by a qualified health care professional or qualified chemical dependency professional;

(b) A determination that the disorder contributed to cause the misconduct;

(c) In the case of mental disorder, a sustained period of successful treatment or in the case of substance use disorder or nonsubstance-related disorder, a certification of successful completion of an approved treatment program;

(d) A prognosis from a qualified health care professional or qualified chemical dependency professional that the attorney will be able to return to competent, ethical professional practice under specified conditions.

**{¶ 66}** The board found that Horton failed to provide evidence in support of the last three requirements. It also noted that "by all accounts, including his own testimony, Respondent did not drink during the work day." Horton's alcohol use was not a contributing factor to the misconduct that occurred during work hours, including the campaign-finance violations, sexual harassment in the workplace, and misuse of county time and resources for his campaign. In fact, rather than relying on his alcohol use as a defense, Horton maintained that much of the misconduct never occurred, and he has never alleged that the criminal conduct to which he admitted was related to his substance abuse. We agree with the board that Horton's substance abuse should not be construed as a mitigating factor, because he failed to establish that his alcohol use contributed to the bulk of his misconduct.

**{¶ 67}** In evaluating the other aggravating and mitigating factors, the board focused on Horton's failure to take responsibility and failure to comprehend his position of power as a judge.

**{¶ 68}** For example, the board notes that Horton's attorney set the tone for the hearing in his opening statement when he argued that M.B. "gave as much as she got." When asked if Horton's sexual contact with M.B. was consensual in his mind, Horton answered, "Based on her activities and what she said and did, there was no question that this was consensual contact, and that's putting it kindly."

When asked if he encouraged another person to lift up M.B.'s shirt, Horton replied that "M.B. was doing enough of the lifting up of her own shirt and also grinding on her own."

{¶ 69} Eventually, however, Horton admitted, "It was my fault. I don't blame M.B. for her being in that position. I had the responsibility. I was the Judge. I was the more mature person. I was the adult." But after this admission, when questioned about why he thought making sexual statements to staff was appropriate, he responded, "If we're engaging in conversation and you're talking about someone's penis, and you're talking about different ways to do this and do that, any conversation to that point * * * I'm assuming it's—it's—it's fair game * * * we're both sharing the stories, so it's not unwelcome." When asked if he had ever heard that "subordinates sometimes feel pressured to go along with what they perceive as the boss's or their superior's way of doing things," Horton cast blame on his staff, stating that they were "hopping up at 4:00 o'clock saying, 'Boss, where are we going?' * * * every five minutes." After admitting some responsibility, Horton went on to say, "I wish we had video of the conversations or recordings of what they said, what they did, so that you can look at it and tell me whether this conversation was forced or was not forced." Because we find that Horton made inconsistent statements regarding his responsibility for his sexual misconduct, we find that any statements accepting responsibility lack sincerity, particularly in light of his numerous attempts to deflect responsibility by pointing to certain actions and statements of his victims.

{¶ 70} Horton also blamed his staff for the violations alleged in parts of Count Two. Horton admitted that he told his county staff, "If you want to work on [the campaign], you want to volunteer, that's great, you know, I would appreciate it * * *." And he testified that his staff members who volunteered did so on their own volition, although he admitted that he suggested that attendance at his fundraisers could benefit their careers.

**{¶ 71}** After members of his judicial staff agreed to volunteer on the campaign, merely encouraging his judicial staff to attend a judicial-campaign seminar did not fulfill his obligation to ensure that his staff did not conduct campaign work on county time. Although Horton testified that he occasionally instructed his judicial staff not to work on county time or use county resources for campaign work, he abdicated any responsibility for enforcing that rule. As to using leave time, he stated that he believed it was up to his staff "to keep track of all [their] balances, whether * * * personal, sick, vacation, flex." And while he testified that he expected his employees to complete campaign work "at lunch, or after work, or whatever, it's [their] prerogative," he continued to give them campaign assignments during work hours and did not reinforce a ban on working on county time or using county resources.

**{¶ 72}** The other factor that the board relied on is nearly inseparable from Horton's failure to take responsibility—his failure to recognize the power that came from his position as a judge and his repeated abuse of that power. The Code of Judicial Conduct imposes rules and expectations on judges, in order to uphold "the principle that an independent, impartial, and competent judiciary * * * will interpret and apply the law that governs our society * * * and enhance confidence in our legal system." Preamble, Section 1. "Judges should maintain the dignity of judicial office at all times and avoid both impropriety and the appearance of impropriety in their professional and personal lives. They should aspire at all times to conduct that ensures the greatest possible public confidence in their independence, impartiality, integrity, and competence." Preamble, Section 2. Judges are in a position to exert power over their employees, the attorneys who practice before them, and the litigants in cases over which they preside. Recognizing this power, we have held that " '[j]udges are held to higher standards of integrity and ethical conduct than attorneys or other persons not invested with the public trust.' " *O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 57, quoting

24

Shaman, Lubet & Alfini, *Judicial Conduct and Ethics* 1 (3d Ed.2000). Judges should comport themselves in a manner that is beyond reproach. *Cincinnati Bar Assn. v. Heitzler*, 32 Ohio St.2d 214, 221, 291 N.E.2d 477 (1972). Far from engaging in behavior that was beyond reproach, Horton exercised poor judgment in his professional and personal lives—in his campaign, in his office, and after hours. As the board recognized, his "conduct demeans the public's trust in the legal system."

**{¶ 73}** Horton failed to recognize that as a judge, he was responsible for setting the tone for his office and creating an atmosphere of integrity and ethical conduct that would inspire confidence in the judiciary. Instead, he created a hostile work environment and allowed county resources to be used to benefit his judicial campaign. Then he blamed his staff for causing his own unethical and inappropriate behavior.

**{¶ 74}** In light of Horton's failure to take responsibility, we find that limited weight should be accorded to the evidence he offered in mitigation. A severe sanction is necessary to protect the public from future harm and to impress upon Horton and the rest of the state's judiciary that campaign-finance violations, abuse of public resources and trust, and sexual harassment and misconduct by judges will not be condoned.

**{¶ 75}** To determine a sanction that adequately protects the public, we consider the sanctions imposed in similar cases. However, as we explained in response to Horton's objection to the imposition of an indefinite suspension, this is a unique case. Although some of our precedent addresses conduct that is similar to at least one of Horton's violations, no party has pointed to, and we have been unable to find, any case that includes the range of misconduct that Horton committed. And, as we noted in response to the third objection, we have found no Ohio case in which a judge was punished for sexual misconduct pursuant to Jud.Cond.R. 2.3.

**{¶ 76}** We take seriously our responsibility for setting precedent concerning Jud.Cond.R. 2.3, and we agree with the board that an indefinite suspension is the sanction that will best serve to protect the public by deterring the kind of damaging conduct present here. The ABA's Joint Commission to Evaluate the Model Code of Judicial Conduct recognized more than a decade ago that "sexual harassment deserves special mention, given the significance of the problem." Harrison, 28 Just.Sys.J. 257 at 263. The large scope of the problem, its detrimental impact on individual victims and the public at large, and the distrust created when charges are brought against members of the judiciary are even more evident today than they were in 2007.

**{¶ 77}** Although an indefinite suspension may not be appropriate in all cases of sexual misconduct or harassment in violation of Jud.Cond.R. 2.3, we find that an indefinite suspension is the appropriate sanction here given the number of other violations, the harm to individual victims and to the public trust, the significant number of aggravating factors, and the limited mitigating evidence. We will protect the public by sending a strong message to members of the judiciary that abusing the trust of public employees and the public at large will result in significant consequences.

**{¶ 78}** The board adopted the findings of fact and conclusions of law made by the hearing panel. It then recommended that Horton be indefinitely suspended from the practice of law in Ohio with reinstatement conditioned on his (1) continued participation in Alcoholics Anonymous, (2) submission to a new OLAP evaluation and compliance with any treatment and counseling recommendations arising from the evaluation, (3) not contacting the former employees and interns who testified in those proceedings, and (4) payment of the costs of these proceedings. Having reviewed the record, the board's report, Horton's objections to the recommendation and disciplinary counsel's response to those objections, and our precedent, we agree.

26

{¶ 79} Accordingly, we overrule Horton's objections and impose the board's recommended sanction. Horton is indefinitely suspended from the practice of law in Ohio with reinstatement conditioned on his (1) continued participation in Alcoholics Anonymous, (2) submission to a new OLAP evaluation and compliance with any treatment and counseling recommendations arising from the evaluation, (3) not contacting the former female employees and interns who testified in those proceedings, and (4) payment of the costs of these proceedings. Costs are taxed to Horton.

Judgment accordingly.

KENNEDY, FRENCH, FISCHER, DeWINE, DONNELLY, and STEWART, JJ., concur.

_____

Scott J. Drexel, Disciplinary Counsel, and Audrey E. Varwig, Assistant Disciplinary Counsel, for relator.

Brunner Quinn, Rick L. Brunner, and Patrick M. Quinn, for respondent.

_____