[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Ohio State Bar Assn. v. Winkler*, Slip Opinion No. 2024-Ohio-3141.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-3141

OHIO STATE BAR ASSOCIATION *v*. WINKLER.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Ohio State Bar Assn. v. Winkler*, Slip Opinion No. 2024-Ohio-3141.]

*Judges—Misconduct—Violations of the Rules of Professional Conduct—Public reprimand.*

(No. 2024-0488—Submitted May 7, 2024—Decided August 21, 2024.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2023-032.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and DEWINE, DONNELLY, and STEWART, JJ. FISCHER, BRUNNER, and DETERS, JJ., did not participate.

**Per Curiam.**

{¶ 1} Respondent, Ralph Edward Winkler, of Cincinnati, Ohio, Attorney Registration No. 0037930, was admitted to the practice of law in Ohio in 1987. He was elected to the Hamilton County Court of Common Pleas, Probate Division, in November 2014 and was reelected in 2020. He has previously served as a judge of the Hamilton County Court of Common Pleas, General Division, and the Hamilton County Municipal Court.

{¶ 2} In an October 2023 complaint, relator, Ohio State Bar Association, charged Winkler with professional misconduct for permitting court staff to make inaccurate comments to the press about a pending guardianship case and for then posting similar comments to the court's Facebook page himself. Winkler waived a determination of probable cause and, in his answer, admitted every allegation contained in the complaint. The parties submitted stipulations of fact, misconduct, and aggravating and mitigating factors, along with 32 stipulated exhibits.

{¶ 3} Winkler was the only witness to testify at his hearing before a three-member panel of the Board of Professional Conduct. The panel issued a report in which it found by clear and convincing evidence that Winkler had committed four violations of the Code of Judicial Conduct and recommended that we publicly reprimand him. A fifth alleged rule violation was unanimously dismissed on the joint motion of the parties. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction. We adopt the board's findings of misconduct and publicly reprimand Winkler.

## BACKGROUND

{¶ 4} Winkler's misconduct in this case arises out of a conservatorship and guardianship for Mary Frances McCulloch administered by the Hamilton County Court of Common Pleas, Probate Division, that predates Winkler's election to that bench. In 2013, McCulloch was an 83-year-old widow with three adult children: Theresa McClean, Kathleen Bosse, and John Robert ("Rob") McCulloch.

**{¶ 5}** In July 2013, McCulloch, with the aid of counsel, filed an application for appointment of a conservator in which she alleged that she was a competent adult who was physically infirm and sought to have an attorney (who was not a family member) appointed as her conservator. The probate court granted the application and appointed the attorney as McCulloch's conservator. In August, Theresa applied to terminate the conservatorship on the ground that McCulloch was mentally incompetent. Theresa filed an application to be appointed as McCulloch's guardian, and McCulloch's conservator filed a contingent guardianship application.

**{¶ 6}** In March 2014—ten months before Winkler took the probate-court bench—the court adopted a magistrate's decision declaring McCulloch incompetent, effectively terminating the conservatorship, *see* R.C. 2111.021, and appointing the attorney who had served as her conservator as her guardian. In the fall of 2015, the guardian resigned, and Winkler, as the sole probate-court judge, granted an application to appoint another attorney as a successor guardian.

**{¶ 7}** In the years that followed, Rob and Kathleen sent numerous letters and emails to the probate court accusing the guardian of misconduct and complaining about the guardianship process. Those communications were filed in the guardianship as comments or complaints, applications for removal of the guardian, or exceptions to the guardian's accounts. On one occasion, Winkler denied a motion that Rob had filed to set aside a magistrate's order overruling his objections to the guardian's actions.

**{¶ 8}** In addition, Winkler learned that three websites had been created using the names of the guardian and two probate-court magistrates. Although the creators of the websites were not identified, the content of those websites resembled the complaints that Rob and Kathleen had filed with the court and was critical of the guardian, the probate court, and the magistrates.

**{¶ 9}** In March 2019, a detective with the Hamilton County Prosecutor's Office sent Rob a letter regarding "threatening and harassing correspondence" he

had allegedly sent to a probate-court magistrate and several of the assistant county prosecutors. The letter directed Rob to have no further contact with the magistrate or the prosecutor's office regarding McCulloch's guardianship.

**MISCONDUCT**

{¶ 10} In January 2019, a reporter with the news outlet Richland Source contacted the probate court regarding McCulloch's case. Winkler has stipulated that he had authorized the assistant court administrator, Scott Weikel, who was under Winkler's supervision and control, to address public inquiries on behalf of the court. Weikel spoke to the reporter and informed her that McCulloch "was removed from her home because it was a squalid, unsafe living environment" and Rob "was not properly caring for her." The reporter sent Rob an email informing him of what Weikel had said and asking him for a response.

{¶ 11} In October 2020, the court received a letter addressed to Winkler from Kathleen stating that Weikel's statements to the reporter were incorrect. The letter, which included a timeline of events and certain records related to the guardianship proceeding, was filed by the court and forwarded to the guardian. Although the letter was part of the record in the guardianship case, Winkler did not review it.

{¶ 12} At all times relevant herein, the probate court has maintained a Facebook page titled "Hamilton County Probate Court, Judge Ralph Winkler." At his disciplinary hearing, Winkler testified that the page had been set up by his predecessor but that he took it over and added his own name to the page when he became the probate-court judge.

{¶ 13} On October 23, 2020, Winkler posted an interview on his court Facebook page titled "14 questions with Kendal M. Coes." Nearly two years later, on October 7, 2022, Rob made a comment on Winkler's post that was critical of Magistrate Coes. That night, Winkler posted the following response:

Rob McCulloch you're just mad because we had to intercede and take care of your mother when you did not. You were living in your Mothers house in deplorable conditions. I am glad a nice neighbor called Senior Services and we got your Mother into a safe, Clean and healthy care facility. God only knows what would have happened to her if a Good Samaritan neighbor had not reported this elder abuse. The home photos in evidence don't lie. Anyone in the public can look at them as they are part of your Mother's case file.

{¶ 14} At his disciplinary hearing, Winkler testified that Rob posted a reply to his response, to which Winkler then responded with:

You lost your case because you were wrong. You interviewed this poor woman with dementia with leading and suggestive questions to try to prove you weren't wrong. However, you were wrong for not taking care of your mother. When you did make it to Court you often reeked of alcohol. Plus, You also missed many hearings for unknown reasons. Don't try to blame my court or Magistrate Coes for your shortcomings as a son. I am glad your neighbor reported this to the Authorities. Your mother could have died or suffered needlessly if my Court didn't help her.

{¶ 15} Winkler has stipulated that the statements he and Weikel made about McCulloch's being removed from her home due to poor living conditions were incorrect, misleading, and unsupported by the record in the guardianship case. In fact, the record shows that McCulloch's guardian had moved her to an assisted-living-memory-care unit on the belief that she would benefit from the increased structure, supervision, and activities available at the facility. And in his testimony

before the panel, Winkler acknowledged that the photographs he had recalled seeing in the record depicted the condition of McCulloch's home around the time that the guardian sought the court's permission to sell the home—sometime *after* McCulloch had moved to the assisted-living facility.

{¶ 16} In addition, Winkler admitted that several other items in his responses to Rob on Facebook were inaccurate, including his claims that a neighbor had called senior services about McCulloch, that McCulloch was the victim of elder abuse, and that the court had been required to intercede to take care of McCulloch because Rob had failed to do so. Winkler further stipulated that there was no evidence to suggest that a lack of care by Rob or any other family member had necessitated McCulloch's guardianship. Although the board determined that Winkler had not intentionally posted inaccurate information, the parties stipulated and the board found that he had posted those comments without reviewing the record or otherwise refreshing his memory about McCulloch's guardianship case.

{¶ 17} Winkler testified that within a couple hours of posting those comments, he realized that he should not have done so and deleted the posts. He deleted or "hid" Rob's comments and his responses so that they could no longer be viewed on the court's Facebook page and promptly handed over control of the page to two staff members so that he would no longer have the ability to post things on his own. On relator's suggestion, Winkler recused himself from McCulloch's guardianship proceeding in August 2023.

{¶ 18} The parties presented Facebook statistics demonstrating that in the more than three years that Winkler's 2020 post about Magistrate Coes had been visible on Facebook, it had reached 206 people and made 235 "impressions."[1]

---

1. Facebook defines "reach" as "the number of people who [see] any content from [a] Page or about [a] Page. This metric is estimated." "Impressions" are defined as "the number of times any content from [a] Page or about [a] Page entered a person's screen." Facebook, *Differences between Page views, reach and impressions*, https://www.facebook.com/help/274400362581037 /?helpref=uf_share (accessed July 19, 2024) [https://perma.cc/HMD8-KSU4].

However, it is unknown whether anyone other than Rob saw Winkler's 2022 comments before Winkler voluntarily removed them.

{¶ 19} When questioned about the court's current media policy, Winkler testified that the policy is to comment without disclosing details about pending cases. He explained that the court obtains signed releases from families authorizing him to talk about their cases in interviews or Facebook posts about the court's "adoption day" programs.

{¶ 20} The parties stipulated and the board found by clear and convincing evidence that Winker's conduct violated Jud.Cond.R. 1.2 (requiring a judge to act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and to avoid impropriety and the appearance of impropriety), 2.8(B) (requiring a judge to be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity), 2.10(A) (prohibiting a judge from making any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending in any court and from making any nonpublic statement that might substantially interfere with a fair trial or hearing), and 2.10(C) (requiring a judge to require court staff, court officials, and others subject to the judge's direction and control to refrain from making statements that the judge would be prohibited from making under this rule). We adopt these findings of misconduct.

**RECOMMENDED SANCTION**

{¶ 21} When imposing sanctions for judicial misconduct, we consider all relevant factors, including the ethical duties that the judge violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 22} The parties stipulated and the board found that just two aggravating factors are present in this case—Winkler's multiple offenses and the vulnerability of and resulting harm to victims of the misconduct. *See* Gov.Bar R. V(13)(B)(4)

and (8). The board pointed to this court's precedent establishing that lawyers "possess, and are perceived by the public as possessing, special knowledge of the workings of the judicial branch of government," (cleaned up) *Erie-Huron Cty. Bar Assn. v. Bailey & Bailey*, 2020-Ohio-3701, ¶ 50. The board noted that this is especially true for judges. Consequently, the board found that Winkler's inaccurate statements regarding the inception of McCulloch's guardianship and Rob's alleged culpability "could have been perceived as reliable and difficult to defend against." We find that this is also true of the statement issued by Weikel as a spokesperson for the Hamilton County Probate Court while under the supervision and control of Winkler—the sole judge of that court.

**{¶ 23}** As for mitigating factors, the parties stipulated that Winkler has a clean disciplinary record, did not act with a dishonest or selfish motive, made full and free disclosure to the board and exhibited a cooperative attitude toward the disciplinary proceedings, and submitted evidence of his good character and reputation. *See* Gov.Bar R. V(13)(C)(1), (2), (4), and (5).

**{¶ 24}** The board adopted those stipulated mitigating factors and also found that Winkler made a timely, good-faith effort to rectify the consequences of his misconduct by voluntarily removing his Facebook comments shortly after posting them and promptly handing off control of the court Facebook page to staff members. *See* Gov.Bar R. V(13)(C)(3). Winkler testified that the conduct at issue in this case was out of character for him. Indeed, there is no evidence that Winkler has ever done anything like this before, and he testified that he would never do it again. He did not attempt to excuse his conduct but explained that it was motivated in part by a desire to defend Magistrate Coes from what he perceived to be Rob's unjust attack.

**{¶ 25}** The board found that Winkler acknowledged his misconduct and concluded that he is highly unlikely to repeat it. Furthermore, the board credited

Winkler for his forthright acknowledgment of his misconduct and on-the-record apology to Rob McCulloch for his inaccurate statements.

{¶ 26} The parties agreed that a public reprimand is the appropriate sanction for Winkler's misconduct in this case. The board considered several cases advanced by the parties in support of that sanction, including two recent cases with comparable behavior.

{¶ 27} In *Disciplinary Counsel v. Berry*, 2021-Ohio-3864, we imposed a conditionally stayed six-month suspension on a judge who sent numerous Facebook messages to a court employee containing images, memes, or links to videos that were overtly partisan or vulgar, and occasionally sexually suggestive. *Id.* at ¶ 20-21.

{¶ 28} We imposed a similar conditionally stayed suspension in *Disciplinary Counsel v. O'Diam*, 2022-Ohio-1370. There, O'Diam, a probate judge, berated an estate beneficiary in his courtroom for nearly an hour because the beneficiary publicly questioned the apparent conflict of interest created by the judge's permitting his own daughter to practice law in his courtroom. O'Diam then permitted his daughter—an attorney who we concluded was under his direction and control—to interrogate the beneficiary in an intemperate manner and without restriction for more than 15 minutes. The following week, the judge denigrated the beneficiary by making public comments before the county board of commissioners. Finding that O'Diam had planned his course of action against the beneficiary rather than acting in the heat of the moment, we imposed a six-month suspension for his misconduct but stayed the entire suspension on the conditions that he commit no further misconduct and complete six hours of continuing legal education focused on judicial demeanor, civility, and professionalism. *Id*. at ¶ 61, 63.

{¶ 29} The board concluded that Winkler's misconduct was less egregious than the misconduct at issue in *Berry* and *O'Diam*. Finding that Winkler

recognized his misconduct and was highly unlikely to engage in similar misconduct in the future, the board recommends that we publicly reprimand him.

## DISPOSITION

{¶ 30} The primary purposes of judicial discipline are to protect the public, guarantee the evenhanded administration of justice, and maintain and enhance public confidence in the integrity of the judiciary. *Disciplinary Counsel v. O'Neill*, 2004-Ohio-4704, ¶ 33. Sanctions serve as a deterrent to similar violations by judicial officers in the future, they notify the public of the self-regulating nature of the legal profession, and they build confidence in the legitimacy and integrity of the judiciary. *Disciplinary Counsel v. Horton*, 2019-Ohio-4139, ¶ 60.

{¶ 31} In this case, Winkler and Weikel—a court administrator who was under Winkler's supervision and control—made inaccurate, inappropriate, and inflammatory statements regarding the facts of a pending case that were not supported by the record. Although it appears that Winkler's statements were only visible on Facebook for a short time and that Weikel's statements were not widely broadcast to the public, Rob learned of both statements and shared at least one of them with Kathleen.

{¶ 32} Both Rob and Kathleen were active participants in the guardianship proceeding. They had a legitimate interest in ensuring that their mother received appropriate care and had access to her family and that her funds were prudently expended by her guardian to achieve those ends. While Winkler may have been frustrated by their criticisms or the means by which they sought to achieve their objectives, he was nonetheless obligated under the Ohio Code of Judicial Conduct to (1) act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary to avoid impropriety and the appearance of impropriety, Jud.Cond.R. 1.2, (2) be patient, dignified, and courteous to litigants and others with whom he dealt in an official capacity, Jud.Cond.R. 2.8(B), (3) refrain from making any public statement that could

reasonably be expected to impair the fairness of a matter pending in *any* court, Jud.Cond.R. 2.10(A), and (4) require court staff and others under his direction and control to refrain from making any statements that he, himself, would be prohibited from making, Jud.Cond.R. 2.10(C).

**{¶ 33}** Winkler violated each of those duties by personally making statements incorrectly asserting that Rob had neglected and abused his mother and by allowing an authorized spokesperson for the court to make similar misstatements about Rob. Beyond being personally hurtful to Rob and Kathleen, there can be no doubt that those inaccurate statements served to further erode Rob's and Kathleen's already dim confidence in the integrity, impartiality, and legitimacy of the court.

**{¶ 34}** Although Winkler's misconduct consists of two isolated events, he committed multiple rule violations and caused harm to vulnerable victims. However, he also has a clean disciplinary record, did not act with a dishonest or selfish motive, and fully cooperated in the disciplinary proceeding. In addition, he has submitted 26 letters attesting to his good character and reputation. Those letters, including one from a judge, 15 from attorneys, and ten from people who have either appeared in Winkler's courtroom in a professional capacity or worked alongside him in various community organizations, overwhelmingly praised Winkler for his honesty, integrity, fairness, compassion, respect for those who appear in his courtroom, and his community involvement. Winkler has also offered an on-the-record apology to Rob McCulloch, acknowledged the wrongfulness of his statements, and accepted responsibility for his misconduct. On these facts, we agree with the board's assessment that Winkler is highly unlikely to engage in similar misconduct again. And having reviewed the cases cited by the board, we find that the facts of this case are less egregious than *Berry* and *O'Diam*.

**{¶ 35}** Accordingly, we adopt the recommendation of the board and hereby publicly reprimand Ralph Edward Winkler for the misconduct described above. Costs are taxed to Winkler.

Judgment accordingly.

————————

Kelly Heile, Bar Counsel; and Steptoe and Johnson, P.L.L.C., and John C. Ferrell, for relator.

Montgomery Jonson, L.L.P., Lisa M. Zaring, and George D. Jonson, for respondent.

————————