**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. O'Diam*, **Slip Opinion No. 2022-Ohio-1370.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-1370

DISCIPLINARY COUNSEL *v*. O'DIAM.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. O'Diam*, Slip Opinion No. 2022-Ohio-1370.]**

*Attorneys—Misconduct—Violation of Jud.Cond.R. 2.8(B) by failing to be patient, dignified, or courteous to litigants or witnesses while acting in an official capacity and failing to require similar conduct of a lawyer subject to the judge's direction and control—Conditionally stayed six-month suspension.*

(No. 2021-0971—Submitted November 9, 2021—Decided April 28, 2022.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2021-006.

————————

**Per Curiam.**

{¶ 1} Respondent, Thomas Mark O'Diam, of Xenia, Ohio, Attorney Registration No. 0029455, was admitted to the practice of law in Ohio in 1985.  He was appointed judge of the Greene County Probate Court in 2013 and has twice been elected to retain that position.

**{¶ 2}** In a March 29, 2021 complaint, relator, disciplinary counsel, alleged that O'Diam violated a single rule of the Code of Judicial Conduct by engaging in the undignified and discourteous treatment of a beneficiary in a pending estate case after the beneficiary commented publicly about O'Diam's policy of permitting his daughter to practice law in his court.

**{¶ 3}** The parties entered into stipulations of fact and misconduct, and both parties asked that O'Diam be publicly reprimanded for his misconduct. After a hearing, a three-member panel of the Board of Professional Conduct found that O'Diam's conduct violated Jud.Cond.R. 2.8(B) (requiring a judge to be patient, dignified, and courteous to litigants, witnesses, and others with whom the judge deals in an official capacity and to require similar conduct of lawyers and others who are subject to the judge's direction and control). Based upon O'Diam's misconduct, the aggravating and mitigating factors present in this case, and the sanctions imposed for comparable misconduct, the panel recommended that we impose a six-month conditionally stayed suspension.

**{¶ 4}** The board adopted the panel's findings of fact and conclusions of law but recommended that O'Diam be required to serve an actual six-month suspension, that he be immediately suspended from judicial office without pay for the duration of that suspension, and that certain conditions be placed on his reinstatement to the practice of law.

**{¶ 5}** O'Diam objects to the board's findings regarding the applicable aggravating and mitigating factors and to its recommended sanction and contends that the appropriate sanction for his misconduct is a public reprimand.

**{¶ 6}** After a thorough review of the record, we adopt the board's findings of misconduct. For the reasons that follow, we overrule O'Diam's objections to the aggravating and mitigating factors found by the board. However, we sustain O'Diam's objection to the recommended sanction in part and adopt the panel's recommended sanction of a six-month conditionally stayed suspension.

**The Board's Findings of Fact**

{¶ 7} From 1985 to 2013, O'Diam practiced estate-planning, trust, and probate law as a majority shareholder of O'Diam, Stecker & Sove Law Group, Inc. His daughter, Brittany O'Diam, joined the firm after she was admitted to the practice of law in 2010. Following O'Diam's appointment to the bench, his former law firm reorganized. The shareholders of the firm entered into a redemption agreement to purchase O'Diam's shares in the firm and made regular payments to him until March 2021. Brittany remained at the firm and became a shareholder.

{¶ 8} In January 2018, Carolee Buccalo ("Carolee") died. Her granddaughter, who was named as executor in Carolee's will, retained Brittany to represent her in the estate's administration. In May 2018, Brittany filed an application to probate the will in Greene County. Brittany also filed seven waivers of disqualification signed by the beneficiaries of the estate—including three signed by Carolee's son Grant David Buccalo ("Buccalo") in his personal capacity, as a trustee, and as a guardian for one of his brothers. Those waivers disclosed O'Diam's familial relationship to Brittany and his position as a former shareholder and creditor of Brittany's law firm, and they stated that those circumstances may disqualify O'Diam from presiding over the case in which an attorney from his former firm represented the executor. They also acknowledged that while those circumstances might lead someone to question O'Diam's impartiality, the signatories trusted that O'Diam would act impartially and fairly.

{¶ 9} On May 26, 2019, Buccalo attended a public meeting of the Greene County Board of Commissioners and expressed his belief that O'Diam should recuse himself from cases in which O'Diam's family members represent parties. He further stated, "Justice depends on the appearance as well as the reality of fairness in all things. Otherwise, it erodes public confidence in the legal system." Buccalo added that when people leave the courtroom, they need to feel that they "got a fair shake" and that the system "wasn't rigged." Buccalo spoke for

approximately two and a half minutes on this issue and stated that he merely wanted to ensure that the commissioners were aware of O'Diam's practice. He did not specifically mention his mother's estate, nor did he express any concern regarding his own involvement with O'Diam, though he stated that he planned to file a grievance with relator before he moved on to an unrelated topic.[1] The commissioners did not comment on those concerns.

{¶ 10} O'Diam's chief deputy clerk informed the judge of Buccalo's statements to the commissioners, and O'Diam obtained a video recording of that commissioners' meeting. He also spoke with Brittany, scheduled a status conference in Carolee's estate case, and ordered the executor and the three local beneficiaries, including Buccalo, to appear. The scheduling order cautioned, "Failure to attend this Status Conference will be deemed contempt of court." O'Diam discussed the purpose of the status conference with Brittany, but he did not share that information with Buccalo or inform him that he would be called to testify under oath.

*O'Diam's Questioning of Buccalo*

{¶ 11} On June 6, 2019, O'Diam presided over the status conference. O'Diam thanked the beneficiaries "for showing up on such short notice," explained that a "very disturbing incident [had] taken place with the estate," and stated that he needed to get it resolved that day. He then played the recording of Buccalo's comments at the commissioners' meeting.

{¶ 12} After the recording was played, O'Diam called Buccalo to the stand, placed him under oath, and informed him that any false statements he made would constitute perjury. He then cross-examined Buccalo for nearly an hour on issues related to Buccalo's waiver of disqualification and comments to the commissioners. During that questioning, O'Diam presented six documents as exhibits, including

---

1. On June 4, 2019, Buccalo filed a grievance with relator raising concerns about O'Diam's conflict waiver. Relator's intake division dismissed that grievance without investigation in July 2019.

Buccalo's waivers of disqualification, several estate documents, the minutes of the commissioners' meeting, and a copy of Jud.Cond.R. 2.11 (governing a judge's duty to disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned unless the parties and lawyers in the case have agreed on the record that the judge should not be disqualified).

{¶ 13} While questioning Buccalo, O'Diam confirmed that Buccalo had consulted independent legal counsel when he signed the waivers of disqualification. O'Diam told Buccalo to read the waiver of disqualification into the record and then asked him, "Is there anything in the second paragraph that you don't understand?"

{¶ 14} Buccalo became emotional as O'Diam continued to question him. He explained that he was "an emotional mess" when he signed the waiver of disqualification and stated that he did not read the document closely. O'Diam inquired, "[D]id anybody not ever advise you that before signing your name on a document, you should read it?" Buccalo answered, "[O]f course."

{¶ 15} When O'Diam asked Buccalo if he believed that the commissioners were "over" his court, Buccalo testified, "I think they have some influence. I might be wrong on that." O'Diam replied, "You are." He then asked Buccalo whether he had ever read the Ohio Constitution and the United States Constitution and whether he was aware of the concept that the three branches of government are independent of each other.

{¶ 16} O'Diam also questioned Buccalo about how he was able to comment on the court and "trash" O'Diam to the commissioners, given that the topic did not pertain to any item on the commissioners' meeting agenda. Buccalo explained that he had contacted the commissioners' office before the meeting and was told that they would give him time to speak on the issue. O'Diam responded, "So the board of commissioners knew what the topic was going to be * * * even though they're well aware that they have nothing to do on the authority of a court." O'Diam further stated, "So this—this topic that you spoke on had nothing to do with any prior event

between the court and the board of commissioners. It was a public forum in which you could go make your argument without my knowledge, without me being there. Seems to me it was basically a free shot." Buccalo replied, "Oh, no. I didn't look at it that way," and O'Diam replied, "I do."

{¶ 17} O'Diam told Buccalo that he and the commissioners had had a "run-in" before and that they "almost went to blows" over the commissioners' attempt to interfere with the administration of his court. He then stated, "I would have thought that they would have known the second you started talking about something like that, they would have shut you down," before informing Buccalo, "I will take care of that myself because I'm going to address the commissioners." In response to Buccalo's statement that the commissioners had changed their rules on public comment because people would "demagogue" them, O'Diam replied, "Isn't that exactly what you did about me? That you went in and demagogued me in front of the commissioners * * *." Buccalo stated, "I wouldn't call it demagogue," to which O'Diam responded, "I'll tell you what I would call it. I would call it slander." Although Buccalo attempted to explain, O'Diam interrupted and said, "I need to move on * * *."

{¶ 18} After reading Jud.Cond.R. 2.11(C) (addressing the ability of parties and their lawyers to waive a judge's disqualification in some circumstances) into the record, O'Diam stated that the rules permitted him to preside over the estate based on the waivers signed by the beneficiaries. He then stated, "And yet you feel it necessary to go to a county commission meeting and say just the opposite, that I'm doing things wrong and it's not proper." O'Diam asked Buccalo whether he had contacted the clerk's office about withdrawing his waiver before speaking at the commissioners' meeting. Buccalo answered that he had not and reiterated that it was an "emotional time" for him. O'Diam then asked whether Buccalo had ever called him to express concern about the waiver of disqualification and stated, "I've got a phone. Anybody can call me. They call me all the time." Buccalo responded,

6

"It would never have dawned on me to call you." At one point, Buccalo stated, "I would hope you don't take [my going to the board of commissioners] personally, I don't see it personally." O'Diam, however, replied, "Oh, I see this as very personal."

*Brittany's Questioning of Buccalo*

{¶ 19} After questioning Buccalo for almost one hour, O'Diam allowed Brittany to question Buccalo and make statements on the record without any restrictions for more than 15 minutes. Brittany asked a couple of questions about the waiver of disqualification and then said, "[D]o you expect that I should have known that you had an issue even though I received a signed waiver from you?" Buccalo attempted to explain his concerns and stated, "I'm not trying to argue with you." To which Brittany replied, "I am." Brittany then cross-examined Buccalo regarding conversations that she had had with his attorney—even though Buccalo had not been present during those conversations—and presented her personal notes memorializing one of those conversations as an exhibit.

{¶ 20} O'Diam did not curtail Brittany's questioning of Buccalo in any way, he assisted her in questioning Buccalo. And when Buccalo asked for a glass of water, O'Diam replied, "I don't have any water." He never offered Buccalo a break or made any attempt to obtain water for him.

{¶ 21} Brittany continued to question Buccalo, repeatedly asking whether he had ever raised any concerns about the waiver to her. He told her he did not. Brittany then stated, "And yet you still thought it was appropriate to impugn my character as an attorney in the public forum of a public county commissioners meeting, as well as the character of the court, which has been addressed?" Buccalo responded, "We might have differences of opinion," to which Brittany replied, "We certainly do." Buccalo concluded by stating, "I'm not trying to be rude, but when I did public comments * * * I make a habit of not trying to make them personal." Brittany retorted, "You failed in this account."

**{¶ 22}** After advising Buccalo that several forms that he had signed and delivered to her office were no longer valid, Brittany told him that she felt that the only appropriate way to communicate with him was under oath right then. She explained that his concerns could have been addressed much more efficiently if he had raised them in a timely manner. She closed her questioning by informing Buccalo, "You have cost this estate an extensive amount of money, an extensive amount of heartache and an extensive amount of stress that was all completely unnecessary had you just proceeded like an adult." Buccalo stated, "And I have no response to that," to which Brittany replied, "No you do not. It was not a question. * * * It was a statement," and then claimed, "This is not an adversarial proceeding."

*Conclusion of Status Conference and Entry of Disqualification*

**{¶ 23}** After entering all the exhibits into the record, O'Diam stated, "I have been a probate judge for six years now. And never in my time on the bench have I ever been as personally offended as I am with you right now." He listed the steps that he and Brittany had followed to disclose their relationship and obtain waivers of disqualification, and he stated, "[Y]ou went to a public forum that has nothing to do with this court, and you disparaged and slandered me personally on a public record. * * * And you * * * don't think that was personal?"

**{¶ 24}** Buccalo attempted to interject, but O'Diam interrupted him, stating:

This isn't a discussion. You're done talking I'm talking now. That was the most disparaging thing anybody has ever done toward me. And it was indirectly disparaging toward [Brittany] because you're indirectly accusing her of an ethical violation of not going through the same disqualification. * * * We all listened to the videotape of your statement before the Greene County Board of Commissioners. You didn't tell them you signed a waiver of disqualification.

**{¶ 25}** O'Diam continued:

And yet you think it's perfectly fine to go on a public forum that has nothing to do with this court. They have no control over this court. They have no authority over this court. It has nothing to do with anything that has ever been on their agenda. So they didn't even follow their own rules. You have been admonished to keep your comments to what has been on the agenda before. Nothing about this has ever been on any commission agenda before because I get the minutes every week * * *. So you violated your own rules, and the commission let you do it all so you could publicly slander me.

And I don't believe for a minute that you don't think that was personal * * *. [T]o this minute, I don't know what you were trying to accomplish. Because even if you were correct, even if I hadn't done the disclosures and even if I hadn't done the waivers of disqualification and even if every single thing that I did was completely wrong, the board of county commissioners has nothing to do with that. So you went to the board of the county commissioners for no other purpose than to personally slander and disparage me and [Brittany]. And that's appalling.

**{¶ 26}** O'Diam concluded:

There has not been one thing in this case that we have heard today that didn't file—follow every Supreme Court rule to the letter. In fact, above and beyond what the letter requires.

But since you had a problem, I am going to formally recuse myself from the case, and we are going to get a visiting judge. And, unfortunately, it is going to cause your estate an extensive delay and a lot more money. But I am not going to stand for anybody slandering me or [Brittany] privately or in a public forum when you have absolutely no legal or factual basis for doing so. What you did is despicable. We're finished.

{¶ 27} Later that day, O'Diam issued a notice of recusal and disqualification, stating that Buccalo had publicly raised concerns about the integrity and ethics of the probate court at a Greene County Board of Commissioners meeting and that he had done so "without any basis in law or fact."

*O'Diam's Appearance before the Board of County Commissioners*

{¶ 28} One week after the status conference, O'Diam and Brittany attended a commissioners' meeting to respond to the comments that Buccalo had made to the board. O'Diam explained that he and Brittany obtain waivers of disqualification whenever Brittany represents parties in uncontested cases before him and then spoke specifically about Buccalo's case. O'Diam stated that upon questioning, Buccalo could not explain what motivated him "to publicly disparage and slander me with false allegations in front of this Board." He further told the board, "[Buccalo] chose to be untruthful to you and the public, to unjustly smear myself and my daughter. That is simply despicable."

{¶ 29} O'Diam then claimed, "We do not have a problem in probate court. What we have is a problem with people improperly using this Board as a public forum to lodge unfounded and false accusations." After expressing his disappointment that the commissioners had permitted Buccalo to speak on the issue, O'Diam expressed his opinion that "[t]his is not the proper forum to wage personal vendettas against any public official."

**Findings of Misconduct**

**{¶ 30}** Based upon these facts, the parties stipulated, the board found, and we agree that O'Diam failed to be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity and to require similar conduct of lawyers subject to the judge's direction and control, in violation of Jud.Cond.R. 2.8(B).

**Recommended Sanctions**

**{¶ 31}** When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the attorney violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

*The Panel's Findings of Aggravating and Mitigating Factors*

**{¶ 32}** The panel found that three aggravating factors were present—O'Diam acted with a dishonest or selfish motive, engaged in a pattern of misconduct, and caused harm to a vulnerable victim. *See* Gov.Bar R. V(13)(B)(2), (3), and (8).

**{¶ 33}** Although O'Diam testified that he intended to use the status conference to determine why Buccalo had an issue with the waiver of disqualification and whether there was any way to fix it, the panel noted that O'Diam never addressed these topics. The panel found that instead, O'Diam "spent the entirety of the status conference voicing his frustrations with the county commissioners and with Buccalo." The panel further recognized that many of O'Diam's statements during the status conference and his disciplinary hearing "were focused on the effect of Buccalo's statements on [O'Diam's] reputation, the reputation of his daughter, [and] the reputation of his court, as well as how those statements personally offended him." Consequently, the panel noted that it could not find that O'Diam truly believed that his conduct was protecting the integrity of

the legal process, and it concluded that O'Diam had acted with a dishonest or selfish motive.

{¶ 34} The panel rejected O'Diam's suggestion that his misconduct was an isolated incident rather than a pattern of misconduct. It noted that after learning of Buccalo's statements to the commissioners, O'Diam informed Brittany that he intended to schedule a status conference and prepared exhibits and questions for Buccalo. He issued a judgment order scheduling a status conference and compelled the beneficiaries to appear without disclosing the purpose of the status conference to them. At the status conference, he called Buccalo to testify under oath without informing him of his right to have counsel present and interrogated him in a disparaging manner for about an hour before allowing Brittany to continue the interrogation without restriction. Then, a week later—even after having ample time to reflect—O'Diam attended the commissioners' meeting to further publicly denigrate Buccalo. On those facts, the board found that O'Diam engaged in a pattern of misconduct.

{¶ 35} With respect to Buccalo's vulnerability and the harm that O'Diam caused him, the panel noted that Buccalo had recently suffered the loss of his mother. He appeared at the status conference without receiving any indication that the statements he had made to the commissioners would be the focus of the proceeding or that he would be required to testify under oath. Furthermore, the panel noted that Buccalo's request for water during his testimony was denied. And despite O'Diam's attempts during his disciplinary hearing to minimize the harm he had caused Buccalo, the panel found Buccalo's testimony that his experience at the status conference had had a profound effect on his mental health and his relationship with his family to be credible.

{¶ 36} The parties stipulated that three mitigating factors were present, namely, O'Diam did not have a prior disciplinary record, made full and free disclosure to the board *or* exhibited a cooperative attitude toward the disciplinary

proceedings, and submitted evidence of his good character and reputation. *See* Gov.Bar R. V(13)(C)(1), (4), and (5).

**{¶ 37}** Although O'Diam was cooperative during the disciplinary proceeding, the panel found that he did not make a full and free disclosure to the board and that he failed to fully accept responsibility for his misconduct. The panel found that at his disciplinary hearing, O'Diam understated his demeanor and attitude while questioning Buccalo, minimized the effect of his behavior, and tried to legitimize the purpose of the status conference. Moreover, it stated that the evidence suggested that O'Diam had decided that he would recuse himself even before he held the status conference and therefore that "any questioning of Buccalo was entirely gratuitous."

**{¶ 38}** The panel noted that even after witnessing Buccalo's testimony regarding the severe impact this event had on his life, O'Diam continued to impugn Buccalo in his own testimony and in his posthearing brief. For example, O'Diam described Buccalo's testimony as "a lot of overdramatization and * * * overreaching remarks that just never occurred." O'Diam also stated that Buccalo had testified to his perception of events, while O'Diam's testimony was "the opposite of that." O'Diam further suggested that the answer lay only in the audiotape. But the panel found that O'Diam's characterization of his own demeanor at the hearing and his explanation for questioning Buccalo sharply contrasted with the "strident and confrontational tone that is reflected in the audio recording[s]" of the status conference and his remarks to the board of commissioners. The panel concluded that O'Diam simply "fails to recognize that he verbally assaulted a party and a citizen who was properly utilizing the court system and his right to engage in public comment at the commissioners' meeting."

**{¶ 39}** The panel acknowledged that O'Diam sent a letter of apology to Buccalo in May 2021. But the panel declined to find that O'Diam's apology constituted a timely, good-faith effort to rectify the consequences of his misconduct

because it was sent nearly two years after the status conference and just a few weeks before O'Diam's disciplinary hearing. Moreover, the panel found that O'Diam did not adequately acknowledge the gravity of his misconduct in the letter.

*The Panel's Recommended Sanction*

**{¶ 40}** In determining the proper sanction for O'Diam's misconduct, the panel acknowledged that the primary purpose of disciplinary sanctions is not to punish the offender but to protect the public. *See, e.g.*, *Disciplinary Counsel v. Guinn*, 150 Ohio St.3d 92, 2016-Ohio-3351, 79 N.E.3d 512, ¶ 16, citing *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53. It also recognized our recent pronouncement that "[s]anctions serve as a deterrent to similar violations by judicial officers in the future, they notify the public of the self-regulating nature of the legal profession, and they build confidence in the legitimacy and integrity of the judiciary." *Disciplinary Counsel v. Bachman*, 163 Ohio St.3d 195, 2020-Ohio-6732, 168 N.E.3d 1178, ¶ 22.

**{¶ 41}** The panel considered the caselaw that the parties had cited to support their joint recommendation of a public reprimand. But it found that the facts of this case are most analogous to three cases in which we imposed six-month suspensions—two of which were conditionally stayed in their entirety—for comparable judicial misconduct. *See Disciplinary Counsel v. Hoague*, 88 Ohio St.3d 321, 725 N.E.2d 1108 (2000); *Disciplinary Counsel v. Elum*, 133 Ohio St.3d 500, 2012-Ohio-4700, 979 N.E.2d 289; and *Bachman*. The panel therefore recommended that O'Diam be suspended from the practice of law for six months and that the entire suspension be stayed on the conditions that he commit no further misconduct and complete six hours of continuing judicial education focused on judicial demeanor, civility, and professionalism.

*The Board's Recommended Sanction*

**{¶ 42}** The board adopted the panel's findings of aggravating and mitigating factors, but it found that O'Diam's conduct during the status conference

"was nothing more than a premeditated abuse of judicial authority directed at a private citizen who had exercised his constitutional right to address elected officials in a public forum." He then allowed his daughter, who took an oath to conduct herself with dignity and civility and to show respect toward all other persons, "to engage in a calculated, disparaging invective that built on her father's inappropriate statements." Moreover, the board found that the harm to Buccalo was evident throughout his testimony at the disciplinary hearing. Recognizing that judges are "held to higher standards of integrity and ethical conduct than attorneys or other persons not invested with the public interest," *Disciplinary Counsel v. Horton*, 158 Ohio St.3d 76, 2019-Ohio-4139, 140 N.E.3d 561, ¶ 72, the board concluded that an actual suspension was necessary to protect the public and serve as a deterrent to other judicial officers.

{¶ 43} The board therefore amended the panel's proposed sanction and recommended that we suspend O'Diam from the practice of law for six months with no stay, suspend him from judicial office without pay for the duration of that suspension, and require him to complete six hours of judicial education as a condition of reinstatement to the profession.

### O'Diam's Objections to the Aggravating and Mitigating Factors
### Found by the Panel and Board

{¶ 44} O'Diam asserts that the record contains insufficient evidence to support the board's findings that he (1) engaged in a pattern of misconduct, (2) acted with a dishonest or selfish motive, (3) failed to accept full responsibility for his misconduct, and (4) failed to make full and free disclosures to the board.

{¶ 45} O'Diam contends that he committed a single rule violation and that the board improperly found that he had engaged in a pattern of misconduct by indicating that the record in this matter would support a finding of other rule violations that were not charged in the complaint. The board relied on his discussion with Brittany regarding the purpose of the status conference, his

preparation of exhibits for the status conference, his attendance at the commissioners' meeting the following week, and his routine monitoring of the commissioners' meetings to support its finding that he engaged in a pattern of misconduct. O'Diam contends that he was not afforded fair notice regarding those "other violations" as required by the fundamental principles of procedural due process. *See, e.g.*, *Disciplinary Counsel v. Reinheimer*, 162 Ohio St.3d 219, 2020-Ohio-3941, 165 N.E.3d 235, ¶ 19 (rejecting on due-process grounds the board's findings that respondents committed rule violations that were not charged in the complaint); *Cuyahoga Cty. Bar Assn. v. Judge*, 96 Ohio St.3d 467, 2002-Ohio-4741, 776 N.E.2d 21, ¶ 1 (same). But these contentions are without merit.

**{¶ 46}** It is true that in a footnote, the board opined that the record would support a finding that O'Diam committed other ethical violations. But the board also specifically acknowledged that O'Diam "was charged with the single violation found by the panel," and it made no additional findings of misconduct. We find, however, that relator's complaint charged—and the board's findings demonstrate—that O'Diam violated Jud.Cond.R. 2.8(B) in three respects. Specifically, O'Diam failed to conduct himself in a patient, dignified, and courteous manner while interrogating Buccalo at the status conference *and* while appearing before the county commissioners. He also failed to require Brittany—an attorney who was under his direction and control—to conduct herself in a patient, dignified, and courteous manner when she questioned Buccalo at the status conference. Because we find that the evidence amply demonstrates that O'Diam engaged in a pattern of misconduct, we need not determine whether the board's mere mention of other uncharged rule violations violated O'Diam's right to due process. *See State v. Talty*, 103 Ohio St.3d 177, 2004-Ohio-4888, 814 N.E.2d 1201, ¶ 9 ("It is well settled that this court will not reach constitutional issues unless absolutely necessary").

{¶ 47} Next, O'Diam challenges the board's intertwined findings that he acted with a selfish or dishonest motive, failed to accept responsibility for his misconduct, and failed to make full and free disclosures in the disciplinary process. His objections, however, are unavailing.

{¶ 48} O'Diam did enter into stipulations of fact, and he admitted that his conduct violated Jud.Cond.R. 2.8(B). During his disciplinary hearing, however, O'Diam denied that he had a personal motive for questioning Buccalo. Instead, he claimed that he was "carrying out [his] responsibilities as the judge." He further maintained that the purpose of the status conference was to determine whether the waivers that Buccalo signed remained valid and whether he could continue to preside over the case. While that would have been a legitimate purpose for conducting a status conference, O'Diam never asked Buccalo if he had any concerns about the waivers, what those concerns were, or whether there was any way to alleviate those concerns that would permit O'Diam to continue to preside over the case. Consequently, the panel and board did not find O'Diam's testimony regarding his intended purpose for the status conference to be credible. On the contrary, they found that O'Diam's primary concerns were the effects that Buccalo's public statements had on the judge's reputation, his daughter's reputation, and the reputation of his court and how those statements personally offended him. The record fully supports those findings.

{¶ 49} There can be no doubt that O'Diam was upset that Buccalo publicly made statements about him and his daughter *and* that he made those statements to the county commissioners, with whom O'Diam had had several prior disputes. During the June 2019 status conference, O'Diam repeatedly stated that he believed that the matter was "personal" and that he was "personally offended." O'Diam complained that Buccalo "proceeded to trash [him]" and took a "free shot" when he was not present to defend himself. He also accused Buccalo of slandering him and Brittany—though he later admitted that he was "a public official and would

never have a case against [Buccalo] for slander." During the status conference and in his statements before the commissioners, O'Diam claimed that Buccalo's brief statement to the commissioners—which politely raised general concerns about Brittany's practice in O'Diam's courtroom, without specifically addressing Buccalo's personal involvement with the court—was "despicable."

{¶ 50} During his disciplinary hearing, O'Diam denied that he had any lingering issues with or animosity toward the county commissioners and claimed that his conduct had "nothing to do with [his] being vindictive toward them." But the timing and content of his interrogation of Buccalo belie that claim. In fact, just one month before the status conference at issue in this case, this court issued a peremptory writ prohibiting O'Diam from enforcing orders related to a dispute he had had with the commissioners regarding courtroom space. *State ex rel. Greene Cty. Bd. of Commrs. v. O'Diam*, 156 Ohio St.3d 458, 2019-Ohio-1676, 129 N.E.3d 393. During the status conference, O'Diam questioned Buccalo extensively about the commissioners' procedures and Buccalo's communications with the commissioners. He also briefly lectured Buccalo about the judge's prior disputes with the commissioners. But even as O'Diam claimed those disputes were in the past, he voiced his frustrations with the commissioners and stated his intention to speak with them about their decision to hear Buccalo's comments about his courtroom practices. Despite claiming that he realized "right away" that his conduct toward Buccalo was inappropriate and despite having a full week to reflect on that conduct, O'Diam forged ahead to attend the commissioners' meeting and once again speak disparagingly about Buccalo.

{¶ 51} O'Diam testified that he had "set the wrong tone" at the status conference and stated that he had not intended to berate Buccalo, to humiliate him, to embarrass him, to cause him undue stress, or to cause him any harm, but Buccalo described O'Diam's conduct at the status conference as "angry," "full of rage," "demeaning," "cruel," and "dehumanizing." O'Diam claimed that Buccalo's

testimony "vastly embellished" what happened at the status conference and expressed his view that Buccalo's testimony regarding the harm caused by O'Diam's conduct was not "real credible." While we do not find that O'Diam's misconduct rose quite to the level that Buccalo claimed, we nonetheless agree with the board's assessment that O'Diam's tone and demeanor were more "strident and confrontational" than he would have us believe.

{¶ 52} O'Diam apologized for his misconduct, describing it as a "mistake" and stating that he was "deeply sorry for it." He explained, "I let my frustration and my emotions cloud my judgment on how to best handle the situation. It wasn't the right thing to do. And I take full responsibility for it." But given O'Diam's efforts to convince the panel that his one-hour diatribe was not "personal" and that he was legitimately attempting to determine whether Buccalo had an issue with the waivers, the panel did not find O'Diam's apology and professed effort to accept responsibility to be credible. Because the record does not weigh heavily against those findings, we defer to the panel's credibility determinations. On these facts, we agree with the panel and board's assessment that O'Diam acted with a selfish or dishonest motive, failed to accept full responsibility for his misconduct, and did not make full and free disclosure to the board.

### O'Diam's Objection to the Recommended Sanctions

{¶ 53} In his final objection, O'Diam contends that this court's precedent supports the imposition of a public reprimand for his misconduct. He notes that in *Disciplinary Counsel v. Mestemaker*, 78 Ohio St.3d 92, 93, 676 N.E.2d 870 (1997), we publicly reprimanded a judge who exhibited several disappointing lapses of conduct and decorum in an otherwise distinguished 15-year judicial career. Mestemaker's misconduct consisted of making derogatory remarks related to one litigant's national origin, ordering marriage as a condition of probation in three cases involving domestic violence, and displaying a lack of judicial temperament in three other cases. *Id*. at 92. We did not make any findings regarding aggravating

factors in that case, but we attributed some mitigating effect to the facts that Mestemaker had experienced physical stress and fatigue as a result of his growing domestic-violence caseload and had presented evidence of his good character and reputation. *Id*. at 93. And by the time we disciplined Mestemaker, there was little chance that he would repeat his conduct, because he had lost his bid for reelection and was no longer a judge. O'Diam also attempted to distinguish his misconduct from that of the respondents in the three cases that the panel cited in support of its recommended sanction of a six-month conditionally stayed suspension. We find, however, that those cases are the most instructive.

{¶ 54} In *Hoague*, 88 Ohio St.3d 321, 725 N.E.2d 1108, we imposed a six-month conditionally stayed suspension on a judge who misused his judicial authority to summon the owner and driver of a car to his courtroom to answer for conduct that he had personally witnessed and that he perceived to be reckless driving. After making false statements on court letterhead to intimidate the vehicle's owner and driver into appearing before him, Hoague conducted an "arrogant inquisition" of them, *id*. at 323, personally reprimanded them, and threatened (and attempted) to contact their employer about their driving habits. Hoague was convicted of a misdemeanor count of coercion for his misconduct. We found that he had failed to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

{¶ 55} Similarly, in *Elum*, 133 Ohio St.3d 500, 2012-Ohio-4700, 979 N.E.2d 289, we imposed a six-month conditionally stayed suspension on a judge who directed vulgar and intemperate language toward a criminal defendant during a "probation review" when neither the defendant's counsel nor the prosecutor was present. *Id*. at ¶ 6, 27. Elum also improperly injected himself into a local law-enforcement agency's internal investigation of alleged officer misconduct arising out of another case that was pending in his court. *Id*. at ¶ 18.

**{¶ 56}** We found that Elum's conduct violated multiple rules, including those that require a judge (1) to act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, (2) to be patient, dignified, and courteous to litigants, and (3) to uphold and apply the law and to perform all duties of the judicial office fairly and impartially. *Id.* at ¶ 19. The four mitigating factors present in *Elum* largely mirrored the factors that are present in this case, with the addition of a finding that Elum had not acted with a dishonest motive. But just one aggravating factor was present—Elum's pattern of misconduct. *Id.* at ¶ 23.

**{¶ 57}** In contrast, in *Bachman*, 163 Ohio St.3d 195, 2020-Ohio-6732, 168 N.E.3d 1178, a magistrate stopped a hearing and left the bench to locate a woman whose momentary scream in the hallway was audible in his courtroom. He then escorted the woman to his courtroom, summarily held her in direct contempt of court, and sentenced her to jail. The woman was incarcerated for two days before the presiding judge ordered her release.

**{¶ 58}** Four mitigating factors were present in *Bachman*—the absence of prior discipline, full and free disclosure to the board or cooperative attitude, evidence of Bachman's good character or reputation, and the loss of his employment. *Id.* at ¶ 14. And we balanced those mitigating factors against three aggravating factors, namely, Bachman's dishonest or selfish motive, his refusal to acknowledge the wrongful nature of his misconduct, and the vulnerability of and resulting harm to the victim. *Id.* Recognizing that an abuse of judicial power that deprives a person of his or her liberty is a significant violation of the public trust, *id.* at ¶ 33, we rejected the board's recommendation of a fully stayed suspension and suspended Bachman from the practice of law for six months "to make crystal clear to the public that this type of judicial misconduct will not be tolerated," *id.* at ¶ 36.

**{¶ 59}** O'Diam contends that the misconduct in *Hoague*, *Elum*, and *Bachman* was more egregious than his own because the respondents in those cases were found to have committed multiple ethical violations, while he violated a single rule of judicial conduct. He argues that in contrast to Hoague, who summoned ordinary citizens with no matters pending before his court, Buccalo was a beneficiary in a pending case and was, therefore, properly subject to his court's jurisdiction. Moreover, he asserts that there was no allegation, let alone any finding, that he made any false statements or was convicted of any criminal offense like Hoague.

**{¶ 60}** Although O'Diam had the authority to convene a status conference to inquire about Buccalo's desire to withdraw his waiver of disqualification, the evidence shows that that was not the true focus of O'Diam's inquiry. Instead, O'Diam berated Buccalo for nearly an hour for what he perceived to be Buccalo's personal attack against him in an unfriendly public forum, allowed his daughter to continue his line of intemperate interrogation, and then appeared at the commissioners' meeting the following week to once again accuse Buccalo of publicly disparaging and slandering him and Brittany. And in contrast to *Hoague*— in which we identified no aggravating factors—there are three aggravating factors present here to balance against an equal number of mitigating factors.

**{¶ 61}** In contrast to Bachman, who reacted in the heat of the moment to address an errant scream outside his courtroom, O'Diam planned his course of action against Buccalo—and had more than a week to contemplate whether it was appropriate for him to appear before the commissioners and publicly berate Buccalo for a second time. We nonetheless agree with O'Diam's assertion that his misconduct did not rise to the level of Bachman's, largely because it did not culminate with a period of incarceration as the incident in *Bachman* did.

**{¶ 62}** On these facts, we agree with the panel's assessment that the facts of this case are most comparable to those of *Hoague* and *Elum*. We therefore sustain

in part O'Diam's objection to the board's recommended sanction and adopt the panel's recommendation that he be suspended from the practice of law for six months, with the suspension stayed in its entirety on conditions.

### Conclusion

{¶ 63} Accordingly, Thomas Mark O'Diam is suspended from the practice of law in Ohio for six months, with the suspension stayed in its entirety on the conditions that he commit no further misconduct and complete six hours of continuing judicial education focused on judicial demeanor, civility, and professionalism. If O'Diam fails to comply with any condition of the stay, the stay will be lifted and he will serve the full six-month suspension. Costs are taxed to O'Diam.

Judgment accordingly.

KENNEDY, FISCHER, DEWINE, DONNELLY, and STEWART, JJ., concur.

O'CONNOR, C.J., and BRUNNER, J., concur in part and dissent in part and would impose the sanction recommended by the Board of Professional Conduct.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Lia J. Meehan, Assistant Disciplinary Counsel, for relator.

Kegler, Brown, Hill & Ritter and Christopher J. Weber, for respondent.

_____