**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. O'Diam*, **Slip Opinion No. 2023-Ohio-1118.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2023-OHIO-1118

DISCIPLINARY COUNSEL *v*. O'DIAM.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. O'Diam*, Slip Opinion No. 2023-Ohio-1118.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct— Conditionally stayed six-month suspension.*

(No. 2022-0953—Submitted January 10, 2023—Decided April 6, 2023.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2021-031.

————————————

**Per Curiam.**

{¶ 1} Respondent, Brittany Dawn O'Diam, of Centerville, Ohio, Attorney Registration No. 0086663, was admitted to the practice of law in Ohio in 2010.

{¶ 2} In a December 2021 complaint, relator, disciplinary counsel, alleged that O'Diam violated five professional-conduct rules in representing the executor of a decedent's estate.

**{¶ 3}** The parties entered into 62 stipulations of fact and submitted 84 stipulated exhibits to the Board of Professional Conduct. A three-member panel of the board conducted a hearing, after which it unanimously dismissed three of the five alleged rule violations. The panel issued a report in which it found that O'Diam committed the two remaining alleged violations, which arose from her mistreatment of one of the estate's beneficiaries. Specifically, the panel found that O'Diam's conduct violated Prof.Cond.R. 4.4(a) (prohibiting a lawyer in representing a client from using means that have no substantial purpose other than to embarrass, harass, delay, or burden a third person) and 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

**{¶ 4}** The panel recommended that O'Diam be suspended from the practice of law for six months with the entire suspension stayed on the condition that she commit no further misconduct. The board adopted the panel's findings of fact and misconduct and recommended sanction. No objections have been filed.

**{¶ 5}** After a thorough review of the record, we adopt the board's findings of misconduct and agree that a conditionally stayed six-month suspension is the appropriate sanction for O'Diam's misconduct.

## I.  FINDINGS OF FACT

### A.  The Estate of Carolee Buccalo

**{¶ 6}** On January 1, 2018, Carolee Buccalo died. Carolee's granddaughter, Yvonne Martin, was named as executor in Carolee's will and retained O'Diam to represent her in the estate's administration. In addition to Martin, Carolee's four sons—Grant David ("David"), James, Craig, and Nick Buccalo—were named as beneficiaries. Martin's father, James, was under guardianship in the Montgomery County Probate Court. Under the terms of Carolee's will, James's inheritance was to be placed in a trust for his benefit, to be administered by Martin and David as successor cotrustees.

**{¶ 7}** O'Diam's father, Judge Thomas O'Diam, who is the only probate-court judge in Greene County, presided over Carolee's estate. O'Diam had practiced with her father in his law firm for approximately three years after she was admitted to the practice of law before he was appointed to the bench in August 2013.

**{¶ 8}** Given O'Diam's ties to the judge, her paralegal sent waivers of disqualification for each of Carolee's beneficiaries to sign. Those waivers disclosed that the judge's former law firm was representing a party to the action, that the firm was indebted to the judge under a stock-redemption agreement, and that the judge's daughter was a shareholder in the firm. The waivers further stated that those facts "may lead someone to reasonably question Judge O'Diam's impartiality" and "may disqualify [him]" from presiding over the case. By signing the form, however, the beneficiaries acknowledged their belief that the judge would act "impartially and fairly, despite these circumstances."

**{¶ 9}** In early April 2018, only two of the beneficiaries had signed and returned the waivers. Martin informed O'Diam's paralegal by email that David was being difficult and had not done anything that she had asked of him. The paralegal responded that the case could not be filed until she had received all the waivers, but she also stated, "[I]f David is going to be difficult we can petition the court to remove Judge O'Diam and bring in another judge." She explained, "[T]his is going to be an unnecessary expense to the estate and will delay how quickly we can get the estate closed out."

**{¶ 10}** On May 1, 2018, O'Diam filed an application to probate Carolee's will, along with seven waivers of disqualification, including three signed by David in his personal and representative capacities. O'Diam filed the initial inventory and appraisal and a schedule of assets for the estate in July 2018.

**{¶ 11}** With the consent of the other beneficiaries, David purchased Carolee's house from the estate in October 2018. At O'Diam's disciplinary

hearing, David testified that the process started in June or July but that Martin had not immediately responded to his request to purchase the house and then had procrastinated before signing the contract.

{¶ 12} In late February 2019, O'Diam prepared a distributive fiduciary account for the estate. Each of the beneficiaries was asked to sign documents demonstrating their consent to the final accounting and distribution, but it does not appear that they were given any deadline for returning the documents to O'Diam. Neither David nor Nick returned the signed documents to O'Diam's office within a reasonable amount of time. At O'Diam's disciplinary hearing, a probate-court clerk testified that it is not unusual for beneficiaries to fail to return such documents—and O'Diam stipulated that beneficiaries are not legally required to sign them. However, the evidence also showed that O'Diam had not had experience handling estates without the unanimous consent of the beneficiaries. Consequently, O'Diam's paralegal told Martin that they would need to seek guidance from the court about how to proceed if David was not willing to sign the documents. Even after David informed O'Diam's office that his attorney had advised him not to sign the documents—and despite having heard nothing from Nick—O'Diam's paralegal continued to blame David alone for the delays and additional expenses incurred.

## B. David's Comments before the Greene County Board of Commissioners

{¶ 13} On May 23, 2019, David attended a public meeting of the Greene County Board of Commissioners and informed the commissioners that Judge O'Diam had presided over cases in which parties were represented by his family members. David expressed his belief that the judge should recuse himself under those circumstances. David further stated, "Justice depends on the appearance as well as the reality of fairness in all things. Otherwise, it erodes public confidence in the legal system." He added that "[w]hen people leave the courtroom, * * * they need to feel like they got a fair shake" and that the system "wasn't rigged." David spoke for approximately two and a half minutes on this issue and stated that he

merely wanted to ensure that the commissioners were aware of Judge O'Diam's practice. He did not specifically mention his personal involvement with the judge, though he stated that he was planning to file a grievance with relator. The commissioners did not comment on David's concerns.

### C. The O'Diams React to David's Public Comments

{¶ 14} Judge O'Diam learned of David's statements to the commissioners within a few days after they occurred. After determining that David was a beneficiary of Carolee's estate, the judge reviewed the case file to ensure that all the waivers of disqualification had been filed. He called O'Diam to inform her that David had made comments at the commissioners' meeting that raised concerns about the validity of the waivers of disqualification. Then the judge scheduled a June 6 status conference and ordered the executor and beneficiaries to appear. His order cautioned that failure to attend would constitute contempt of court.

{¶ 15} After her call with the judge, O'Diam attempted to determine whether David was represented by counsel. She emailed two attorneys who had previously represented David. She told one of those attorneys that David was being "uncooperative" and was creating additional work for her. Then, after describing David's comments at the county commissioners' meeting, she stated:

> It is apparent to me that his only motivation for speaking at the Commissioner[s'] meeting was to stir the pot and attempt to make my family look bad.
>
> I am sure you can understand that I am extremely upset by this development, as I do not take kindly to my ethics being maligned, especially in a public forum. The Court clerk contacted me today to tell me that [David]'s statements appeared in the Commissioner[s'] minutes, and as a result, the Judge has ordered a

mandatory Status Conference for next week.  It sounds like he is even less happy than I am.

{¶ 16} In late May, David consulted with another attorney about whether he should sign the documents to consent to the final accounting and distribution of the estate.  After receiving the scheduling notice for the status conference, David delivered the signed documents to O'Diam's office.  But by that time, O'Diam had filed an amended inventory and appraisal and an amended schedule of assets disclosing several newly discovered assets that rendered obsolete the documents recently signed by David.

{¶ 17} O'Diam emailed David to inform him that the signed documents did not relieve him of his obligation to attend the status conference and that his attendance was mandatory.  After David asked why O'Diam wanted him there, O'Diam replied, "I did not request your presence at the Status Conference, the Court is requiring that all of the beneficiaries are present."  O'Diam did not inform David that she had spoken with the judge or that David's public comments were the impetus for the status conference.

### D.  The Status Conference

{¶ 18} David attended the June 6 status conference without counsel.  After thanking the beneficiaries for "showing up on such short notice," the judge explained that a "very disturbing incident [had] taken place with the estate."  He stated that he needed to "get it resolved" that day and then played a recording of David's comments at the commissioners' meeting.

{¶ 19} After the recording was played, Judge O'Diam called David to the stand, placed him under oath, and informed him that any false statements he made would constitute perjury.  He examined David for nearly an hour on issues related to David's waiver of disqualification and his comments to the commissioners, the latter of which the judge deemed "slander[ous]" and "despicable."  The judge then

allowed O'Diam to question David and make statements on the record for more than 15 minutes without restriction.

{¶ 20} In Judge O'Diam's disciplinary case, we summarized O'Diam's questioning of David as follows:

> [O'Diam] asked a couple of questions about the waiver of disqualification and then said, "Do you expect that I should have known that you had an issue even though I received a signed waiver from you?" [David] attempted to explain his concerns and stated, "I'm not trying to argue with you[,]" [t]o which [O'Diam] replied, "I am." [O'Diam] then cross-examined [David] regarding conversations that she had had with his attorney—even though [David] had not been present during those conversations—and presented her personal notes memorializing one of those conversations as an exhibit.
>
> [The judge] did not curtail [O'Diam]'s questioning of [David] in any way; rather, he assisted her in questioning [David]. * * *
>
> [O'Diam] continued to question [David], repeatedly asking whether he had ever raised any concerns about the waiver to her. He told her that he had not. [O'Diam] then stated, "And yet you still thought it was appropriate to impugn my character as an attorney in the public forum of a public county commissioners meeting, as well as the character of the court, which has been addressed?" [David] responded, "We might have differences of opinion," to which [O'Diam] replied, "We certainly do." [David] concluded by stating, "I'm not trying to be rude, but when I did public comments * * * I

make a habit of not trying to make them personal." [O'Diam] retorted, "You failed in this account."

> After advising [David] that several forms that he had signed and delivered to her office were no longer valid, [O'Diam] told him that she felt that the only appropriate way to communicate with him was under oath right then. She explained that his concerns could have been addressed much more efficiently if he had raised them in a timely manner. She closed her questioning by informing [David], "You have cost this estate an extensive amount of money, an extensive amount of heartache and an extensive amount of stress that was all completely unnecessary had you just proceeded like an adult." [David] stated, "And I have no response to that," to which [O'Diam] replied, "No you do not. It was not a question. * * * It was a statement," and then claimed, "This is not an adversarial proceeding."

(Ellipses sic.) *Disciplinary Counsel v. O'Diam*, 168 Ohio St.3d 137, 2022-Ohio-1370, 196 N.E.3d 812, ¶ 19-22.

{¶ 21} At the conclusion of the status conference, Judge O'Diam announced that he would formally recuse himself from the case and request that a visiting judge be assigned.

{¶ 22} In this disciplinary proceeding, the board found that beginning with O'Diam's first question, her tone was "argumentative and aggressive" and that "it [was] evident from the audio recording * * * that she was angry with [David]." And although the judge testified that the purpose of the status conference was to determine whether he was able to continue to preside over the estate, neither the judge nor O'Diam allowed David to explain any concerns that he may have had about the waiver he had signed or asked him whether he wished to withdraw it.

{¶ 23} David testified he did not know that the status conference would be focused on his comments at the commissioners' meeting and that had he known that he would be called as a witness, he would have taken an attorney with him. He explained that he felt that he was being "berated and beaten up" and "humiliated" during the judge's questioning and that he "just wanted to survive the hour and be able to leave the courtroom."

{¶ 24} David described O'Diam's tone and demeanor during the status conference as "[a]ggressive," "[m]ean," "[m]ean-spirited," "[a]ngry," and "[d]egrading." In addition to feeling embattled, ambushed, and humiliated, David stated, the abuse he suffered "destroyed [him] in front of [his] brothers" and destroyed his relationship with his family. He explained that after the status conference, he fell into a deep depression that "shut [him] down" for several months. He did not file a grievance against O'Diam, because he feared "retaliation" and "revenge" and he "just [didn't] want to have any part of it." The board noted that David's distress while recounting the experience nearly three years after it happened "was still painfully evident."

### E. Conclusion of the Probate Estate

{¶ 25} In August 2019, a visiting judge was assigned to Carolee's estate. In the meantime, O'Diam had filed the final fiduciary's account, which showed that a balance of approximately $156,000 would be distributed to the beneficiaries. She also had filed an application for authority to pay attorney fees, seeking $8,171 for her work on the estate, which had been approved by Martin.

{¶ 26} That filing included a statement from O'Diam explaining the reasonableness of her fees, which exceeded the amount rebuttably presumed to be reasonable under the applicable local rule. *See* Loc.R. 71.2(E) of the Greene County Probate Court. In that statement, O'Diam repeatedly referred to David as the "problematic" beneficiary and stated that he had been "a consistent source of unnecessary distress for the Executor from the start of the administration" and that

his actions had "led to extensive additional time spent by the Executor and Counsel."She stated that she had sent copies of a final distributive account to the beneficiaries with documents for them to sign but claimed that the "problematic" beneficiary failed to return them even though he had not expressed any objections to their content. Although O'Diam now acknowledges that the beneficiaries were not required to sign the documents, she opined in the statement that "[t]his lack of cooperation resulted in the need to revise the final account * * * to make it a final non-distributive account."

{¶ 27} In her request for additional fees, O'Diam also stated that the revised final nondistributive account was ready to file when the court informed her of the need for a status conference "to address a complaint levied by the problematic beneficiary with the Greene County Commissioners" relating to "alleged misconduct of Counsel and the Court." She claimed that given the "additional disruption" created by those accusations, she "had no choice but to request an extension of the due date for the final account." O'Diam concluded her request for additional fees by noting that she had voluntarily reduced her fee to an amount that the court could approve without requiring each beneficiary's consent because she was "sympathetic to the non-problematic beneficiaries" and felt that it was "unfair for them to have to bear even more of a burden due to one beneficiary's need to cause unnecessary problems."

{¶ 28} In contrast to O'Diam's explanation, which blamed David for all the delays and increased costs incurred by Carolee's estate, the board found that many other factors had contributed to those delays and costs. Those factors included newly discovered assets that required amendments to the inventory and schedule of assets, Martin's delay in consenting to the sale of the house, Nick's failure to return signed documents within a reasonable timeframe, O'Diam's lack of knowledge about how to proceed without the consent of all beneficiaries, Judge O'Diam's decisions to schedule the status conference and to recuse himself due to his outrage

regarding David's public comments, and O'Diam's request for an extension of time for the final account so that she could seek attorney fees for the status conference.

{¶ 29} The visiting judge ultimately approved O'Diam's amended inventory and appraisal and authorized payment of her requested fees. O'Diam filed the final distributive fiduciary account in October 2019, and checks drawn on an investment-company account were issued to all beneficiaries. At that time, O'Diam's office drafted a letter for Martin to send to David along with a copy of the distributive fiduciary account, a copy of Martin's resignation as cotrustee of James's trust, and two checks—one payable to David and the other payable to David as trustee of James's trust. The estate was closed without objection that December.

### F. O'Diam's Reaction to David's Failure to Deposit the Distribution Checks

{¶ 30} In February 2020, Martin emailed O'Diam's paralegal to inform her that David had not deposited the two distribution checks that had been issued to him. Martin told O'Diam that the envelope containing the checks was "probably at [David's] house unopened because it ha[d] [her] return address on it." A few days later, David sent a text message to Martin stating that the investment company had contacted him about the checks and asking her whether she had resigned from James's trust. Martin emailed a screenshot of the text to O'Diam's paralegal with the comment, "It confirms that he got the call from [the investment company] and knows I'm not a trustee. It also confirms that he did not open his mail."

{¶ 31} The next day, O'Diam sent a letter to James's coguardians—copying the magistrate presiding over James's guardianship and Montgomery County Adult Protective Services ("APS")—in which she alleged that David's failure to deposit James's distribution check into his trust account was "financially abusive to a ward of th[e] Court." Despite her paralegal's knowledge that David had learned just one day earlier that the check was in his possession and that Martin had resigned as cotrustee, O'Diam wrote, "I fear that [David's] inaction may be evidence of a

breach of his fiduciary duties owed to James," adding that James's inheritance had "been effectively held hostage" by David. She opined that it was "inexcusable [for David] to withhold funds from James" when in reality, David had not realized that the funds were in his possession and had never intentionally withheld them from James. Ignoring the role that she and Martin had played in thrusting David into the position of sole trustee, O'Diam accused David of "choosing to ignore his duties as Trustee" and "directly contraven[ing]" his mother's intention to ensure the provision of his brother's care.

{¶ 32} At her disciplinary hearing, O'Diam claimed that she had made the above allegations in connection with her duty as a mandatory reporter of abuse, neglect, or exploitation, *see* R.C. 5101.63(A) (requiring attorneys who have reasonable cause to believe that an adult is being abused, neglected, or exploited to immediately report that belief to the county department of job and family services). Although O'Diam did not believe that David had engaged in any criminal conduct, she knew that her letter would trigger a criminal investigation.

{¶ 33} The board concluded that O'Diam "was not in a position to make an assessment of James's situation or of David['s] suitability to serve in a fiduciary capacity," in part because she had had only minimal contact with David and had never met James. In fact, if she had inquired about James's financial condition at that time, she would have learned that his circumstances were not dire, because he had received money from Carolee's nonprobate assets and had approximately $80,000 in cash on hand.

{¶ 34} The board found that the facts set forth in O'Diam's letter to James's coguardians did not support a reasonable belief that James was being abused, neglected, or exploited and that the letter was "replete with half-truths" and failed to accurately portray O'Diam's knowledge of the situation. Moreover, the board found, the letter had caused additional anguish for David, who later received a "shaming" letter from James's coguardian and faced a criminal investigation into

his handling of James's share of the probate estate. Ultimately, the investigator concluded that "criminal charges would not be appropriate" and that "probate court would be a better arena [in which] to resolve the matter."

## II. FINDINGS OF MISCONDUCT

{¶ 35} The board found that from the time O'Diam learned of David's comments at the county commissioners' meeting, he became the target of her written and verbal disparagement and abuse: she informed attorneys who had represented David that she was having issues with him, that he was being uncooperative, and that he had tried to make her family look bad; in the presence of his family at the status conference, she demeaned and humiliated David and accused him of singlehandedly costing the estate substantial amounts of money; and in their correspondence with Martin and the probate court, she and her paralegal repeatedly referred to David as being "problematic" and unjustly blamed him for all the delays and increased attorney fees incurred in the administration of the estate. In addition, the board found that O'Diam had engaged in retaliatory, demeaning, and humiliating conduct in her questioning of David during the status conference.

{¶ 36} Finding that O'Diam's conduct had no substantial purpose other than to embarrass, harass, delay, or burden David, the board concluded that O'Diam violated Prof.Cond.R. 4.4(a). The board also found that O'Diam's conduct in intentionally triggering a criminal investigation and other humiliating consequences for David with misleading insinuations of financial abuse and mistreatment adversely reflected on her fitness to practice law in violation of Prof.Cond.R. 8.4(h).

{¶ 37} We agree that O'Diam engaged in a pattern of misconduct that had no substantial purpose other than to embarrass or harass David in violation of Prof.Cond.R. 4.4(a). In accord with the board's report, we also find that O'Diam's letter to James's coguardians in which she mischaracterized David's failure to

deposit James's distribution check—which by every indication was an innocent oversight that had just been brought to his attention—as "financially abusive" was sufficiently egregious to warrant finding an additional violation of Prof.Cond.R. 8.4(h). *See Disciplinary Counsel v. Bricker*, 137 Ohio St.3d 35, 2013-Ohio-3998, 997 N.E.2d 500, ¶ 21. We therefore adopt the board's findings of misconduct.

## III. SANCTION

**{¶ 38}** When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the attorney violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

### A. Aggravating and Mitigating Factors

**{¶ 39}** The board found that O'Diam had acted with a dishonest or selfish motive, engaged in a pattern of misconduct, and caused harm to a vulnerable victim. *See* Gov.Bar R. V(13)(B)(2), (3), and (8). The board noted that O'Diam purportedly "regretted the manner" in which she had questioned David at the status conference. It found, however, that her claims that her actions—including her letter to James's coguardians copying the magistrate and APS—were not intended to embarrass, harass, burden, or retaliate against David manifested a refusal to acknowledge the wrongful nature of her conduct—hence a fourth aggravating factor. *See* Gov.Bar R. V(13)(B)(7).

**{¶ 40}** As for mitigating factors, the board found that O'Diam has no prior discipline and had exhibited a cooperative attitude toward the proceedings by submitting joint stipulations of fact and exhibits. *See* Gov.Bar R. V(13)(C)(1) and (4). In addition, the board found that O'Diam had submitted the testimony of three witnesses and letters from eight colleagues and friends attesting to her good character and/or reputation, some of whom spoke of the good work she had done for her clients, her church, and several nonprofit organizations. *See* Gov.Bar R. V(13)(C)(5).

**B. The Panel's Recommended Sanction**

{¶ 41} In determining the proper sanction for O'Diam's misconduct, the board considered six cases. Two of those cases involved attorneys who, like O'Diam, were found to have violated Prof.Cond.R. 4.4(a). But in contrast to O'Diam, the attorneys in those cases engaged in significant additional misconduct. *See Toledo Bar Assn. v. Yoder*, 162 Ohio St.3d 140, 2020-Ohio-4475, 164 N.E.3d 405 (imposing a two-year suspension, with six months conditionally stayed, on an attorney who violated Prof.Cond.R. 4.4(a) by making false, threatening, and derogatory statements about opposing party and counsel and committed ten additional rule violations); *Disciplinary Counsel v. Harmon*, 158 Ohio St.3d 248, 2019-Ohio-4171, 141 N.E.3d 142 (imposing a conditionally stayed two-year suspension on an attorney who violated Prof.Cond.R. 4.4(a) and six other rules by filing a frivolous lawsuit against his client's daughter and friend to harass and embarrass them and attempt to collect an excessive fee).

{¶ 42} The board found the number and egregiousness of the violations committed in this case to be most similar to those in *Butler Cty. Bar Assn. v. Foster*, 99 Ohio St.3d 491, 2003-Ohio-4130, 794 N.E.2d 26, and *Columbus Bar Assn. v. Jones*, 166 Ohio St.3d 18, 2021-Ohio-4070, 181 N.E.3d 1178.

{¶ 43} During antagonistic collection proceedings, Foster directed certain unprofessional emails and other correspondence to the older brother of a pro se litigant. Subsequent communications from Foster described the brother and his behavior in offensive terms and made a lewd suggestion. We found that Foster violated two provisions of the former Code of Professional Responsibility that are precursors to the rules that O'Diam has been found to have violated here. *See* former DR 1-102(A)(6) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law); former DR 7-102(A)(1) (prohibiting a lawyer from taking action on behalf of a client that the lawyer knows or should know would serve merely to harass or maliciously injure another). We

also found that Foster had engaged in conduct that was prejudicial to the administration of justice and that he had failed to seek the lawful objectives of a client through reasonably available and permissible means. In the presence of two mitigating factors and just one aggravating factor, we found that Foster's pattern of escalating abusive language warranted a conditionally stayed six-month suspension. *Foster* at ¶ 4, 10.

{¶ 44} Jones engaged in harassing conduct by incorporating two business entities using names deceptively similar to the brand names used by his estranged wife's companion and by leaving a threatening message on the companion's voicemail. After the companion filed a disciplinary grievance against him, Jones sent his then ex-wife hostile text messages threatening to retaliate against the companion and stating that the companion's "false" allegations against Jones had threatened their family's security. *Id*. at ¶ 7. In his response to the grievance, Jones falsely stated that he had legitimate purposes for incorporating the businesses and attempted to rationalize his harassing conduct, although he later admitted that the purpose of his actions was to retaliate against the companion for dating his ex-wife.

{¶ 45} We found that Jones had engaged in dishonest conduct, that he had made false statements of material fact in connection with his disciplinary matter, and that his text messages to his ex-wife had adversely reflected on his fitness to practice law. In light of significant mitigating factors—including Jones's clean disciplinary record, his eventual cooperation in the disciplinary process, his acknowledgment of his misconduct, his submission of good-character and reputation evidence, and the ongoing treatment of his mental-health and substance-abuse disorders—we imposed a conditionally stayed six-month suspension for Jones's misconduct. *Jones* at ¶ 11, 14, 19. We also ordered Jones to serve a one-year period of monitored probation. *Id.* at ¶ 19.

{¶ 46} In this case, the board recommends that we impose a conditionally stayed six-month suspension for O'Diam's misconduct, in accord with the

sanctions we imposed in *Jones* and *Foster*. The board acknowledged that we imposed the same sanction on Judge O'Diam even though his conduct at the status conference was more egregious than O'Diam's and, as a judge, he is " 'held to higher standards of integrity and ethical conduct than attorneys or other persons not invested with the public trust,' " *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 57, quoting Shaman, Lubet, & Alfini, *Judicial Conduct and Ethics* 1-2 (3d Ed.2000). Nevertheless, the board concluded that a comparable sanction was warranted in this case because O'Diam had engaged in a pattern of retaliatory misconduct that extended beyond the confines of the status conference.

**{¶ 47}** After David made his comments to the county commissioners, O'Diam claimed that David had maligned her ethics in her own correspondence with David's attorneys before she and her father berated him at the status conference in front of all his siblings. Then, in a public filing in support of her requested attorney fees, she dubbed David "the problematic beneficiary" and like her paralegal before her, blamed David alone for the delay and increased expense incurred by the estate. Finally, O'Diam's misconduct culminated in the letter she sent to James's coguardians, the magistrate presiding over the guardianship proceeding, and APS in which she intentionally triggered a criminal investigation by making misleading insinuations that David had financially abused his disabled brother.

**{¶ 48}** On these facts, we agree that a six-month suspension stayed in its entirety on the condition that O'Diam engage in no further misconduct is the appropriate sanction in this case.

## IV. CONCLUSION

**{¶ 49}** Accordingly, Brittany Dawn O'Diam is suspended from the practice of law in Ohio for six months, with the suspension stayed in its entirety on the condition that she commit no further misconduct. If O'Diam fails to comply with

the condition of the stay, the stay will be lifted and she will serve the full six-month suspension.  Costs are taxed to O'Diam.

Judgment accordingly.

KENNEDY, C.J., and FISCHER, DEWINE, DONNELLY, STEWART, BRUNNER, and DETERS, JJ., concur.

———————————

Joseph M. Caligiuri, Disciplinary Counsel, and Lia J. Meehan and Audrey E. Varwig, Assistant Disciplinary Counsel, for relator.

Kegler, Brown, Hill & Ritter and Christopher J. Weber; and Peterson Conners, L.L.P., and Rasheeda Khan, for respondent.

———————————